**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MAURA CULHANE, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>U.S. PHYSICAL THERAPY, INC., CHRISTOPHER J. READING, LAWRANCE W. MCAFEE, JON C. BATES AND GLENN MCDOWELL,<br><br>Defendants. | Case No: 17-cv-02347-NRB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Sean Reilly ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Second Amended Class Action Complaint for Violations of the Federal Securities Laws against Defendants (defined below), alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public statements, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding U.S. Physical Therapy, Inc. ("USPH" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a Class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired the publically traded securities of USPH from November 6, 2014 through March 16, 2017, both dates inclusive (the "Class Period"), against the Defendants, seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Prior to the market's opening on March 16, 2017, USPH, an operator of outpatient physical therapy clinics, disclosed that previously issued financial statements for the years ended December 31, 2015 and 2014, and all quarters within 2014 and 2015, and the first three quarters of 2016 were materially false and that investors should no longer rely upon them. The Company further disclosed its intention to restate the financial statements for the affected periods and include those restatements in its 2016 Form 10-K. Defendants attributed the restatement to the Company's having violated generally accepted accounting principles ("GAAP"), improperly accounting for redeemable non-controlling interests of acquired partnerships. It further identified material weaknesses in its internal control over financial reporting relating to Defendants' accounting for mandatorily redeemable non-controlling interests. As a result of such weakness, contrary to Defendants' certifications that USPH's internal controls over financial reporting were effective, the Company admitted that, during the Class Period, its disclosure controls and procedures and internal controls over financial reporting were not effective.

3. Starting in October 2014, however, in correspondence with the SEC that Defendants never publically acknowledged, the SEC informed Defendants directly of the appropriate GAAP that USPH should have applied to its accounting for redeemable non-

controlling interests, informing Defendants that FASB ASC 480-10-S99-3A-22 and FASB ASC 260-10-45-1 through 7 controlled. From before the SEC transmitted its first letter to Defendants through the date of the restatement of the Company's financial results, the applicable GAAP did not change. Thus, with knowledge or reckless disregard for the appropriate GAAP Defendants were bound to apply, Defendants were minimally reckless in continuing to misclassify redeemable non-controlling interests as equity. Instead, they applied improper accounting to their mandatory redeemable non-controlling interests, allowing them artificially to inflate, among other things, the Company's earnings per share ("EPS") in each reporting period during the Class Period.

4. During the Class Period, with EPS and the Company's stock price inflated artificially, not only did the Individual Defendants sell substantial portions of their unrestricted USPH shares, but each received bonuses, tied to the materially false EPS. On June 7, 2017, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2016 ("2016 10-K"), disclosing for the first time the Company's 2014 restated financial results, restated results for the first three quarters and year end 2015, and the first three quarters of 2016. Had Defendants disclosed materially accurate EPS, depending on the year, the Company would have paid them either no cash bonus at all or materially less in cash bonuses.

5. Upon Defendants' disclosing the Company's need to restate, the Company's stock price dropped $3.85[1] per share, or 5.2%, from a March 15, 2017 close of 73.75 per share to a March 16, 2016 close of $69.90 per share on unusually heavy trading volume, and continued to decline in the following trading days, to close at $64.75[2] per share on March 21, 2017.

[1] On an adjusted basis, the per share price dropped $3.83 per share.
[2] On an adjusted basis, the per share closing price on March 21, 2017 was $64.35.

6. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

7. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 8 240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company's securities are traded in this Judicial District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

11. Plaintiff Sean Reilly, as set forth in the certification attached to his Motion to Appoint Lead Plaintiff (ECF No. 9-2), purchased USPH securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

12. Defendant USPH is a Nevada corporation headquartered in Houston, Texas. USPH securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "USPH."

13. Defendant Christopher J. Reading ("Reading") has served as the Company's President, Chief Executive Officer and Director since November, 2004, and throughout the Class Period. Reading first joined USPH as Chief Operating Officer in November 2003. From 1990 to

2003, Mr. Reading served in various executive and management positions with HealthSouth Corporation, where most recently he served as Senior Vice President of Operations, responsible for over 200 facilities located in 10 states.

14. Defendant Lawrance W. McAfee ("McAfee") has served as the Company's Executive Vice President, Chief Financial Officer and Director throughout the Class Period. Lawrance W. McAfee joined USPH as Chief Financial Officer in September 2003. In November 2004, Larry was promoted to Executive Vice President and joined the Board of Directors.

15. Defendant Glenn McDowell ("McDowell") was named Chief Operating Officer in January 2005. He joined USPH as Vice President of the West Region in October 2003. From 1996 to 2003, McDowell was employed by HealthSouth Corporation, as Vice President of Operations - West Ambulatory Division, where he oversaw the operations of more than 165 outpatient rehabilitation and other facilities.

16. Defendant Jon C. Bates ("Bates") has served as the Company's Vice President and Corporate Controller throughout the Class Period.

17. Defendants Reading, McAfee, McDowell, and Bates are sometimes referred to herein as the "Individual Defendants."

18. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. directly participated on each earnings call the Company conducted during the Class Period;

c. was directly involved in the day-to-day operations of the Company at the highest levels;

d. was privy to confidential proprietary information concerning the Company and its business and operations;

e. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

f. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

g. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

h. approved or ratified these statements in violation of the federal securities laws.

19. Throughout the Class Period, Defendants appended to each annual and periodic financial report the Company filed with the SEC "Certifications" from Defendants Reading, McAfee, and Bates substantially similar to the following:

> 1. I have reviewed this annual report on Form 10-K of U.S. Physical Therapy, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

20. In addition, to each annual and periodic financial report throughout the Class Period, Defendants appended a "Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002" from Defendants Reading, McAfee, and Bates, substantially similar to the following:

> In connection with the Annual Report of U.S. Physical Therapy, Inc. (the "registrant") on Form 10-K for the year ending December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "report"), we, Christopher J. Reading, Lawrence W. McAfee and Jon C. Bates, Chief Executive Officer, Chief Financial Officer and Controller, respectively, of the registrant, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that to our knowledge:
>
> > (1) The report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
> >
> > (2) The information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

21. USPH is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

22. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to USPH under respondeat superior and agency principles.

23. Defendant USPH and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24. USPH is a Houston-based operator of outpatient physical therapy clinics that provide pre and post-operative care and treatment for orthopedic-related disorders, sports-related injuries, preventative care, rehabilitation of injured workers and neurological-related injuries.

25. USPH generally owns a general partnership interest in the majority of its physical therapy clinics with 1% ownership, and a limited partnership interest with between 49% and 99% ownership interest. The managing therapist(s) of the clinics own the remaining interest as limited partner(s) ("Clinic Partnerships"). USPH refers to the minority limited partnership interests that managing therapists own ("non-controlling Partner") in these limited partnership or limited liability company entities as "non-controlling interests." In a minority of instances, USPH operates its clinics through wholly-owned subsidiaries under profit-sharing arrangements with therapists.

26. USPH has grown nationally over the past 12 years, through strategically acquiring outpatient physical therapy practices. The majority of USPH's 540 clinics in operation at December 31, 2016 - 423 clinics – were operated as Clinic Partnerships. USPH operated the remaining clinics as wholly-owned facilities or through management arrangements.

27. On March 16, 2017, the Company disclosed that the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and all quarters within 2014 and 2015, and the first three quarters of 2016 were materially false and should no longer be relied upon, and that the Company would restate certain figures for the affected periods and include those statements in its 2016 Form 10-K, which was filed on June 7, 2017. USPH stated that it had improperly accounted for redeemable non-controlling interests of acquired partnerships and that

the company's internal controls over financial reporting had material weaknesses and the Company had suffered ineffective internal controls over financial reporting.

**USPH's Historical Accounting for Redeemable Non-Controlling Interests**

28. Historically, USPH accounted for redeemable non-controlling interests as follows: for any acquired non-controlling partner agreement that was entered into on or after January 1, 2009, at the expiration the earliest time when the acquired non-controlling partner ("NC Partner") could require the Company to purchase its interest, as set forth in the respective limited partnership agreement, the Company reclassified the recorded value of the non-controlling interest to temporary equity on the Company's consolidated balance sheet under "Redeemable non-controlling interests" ("RNCI"). The recorded value was the fair value of the non-controlling interest on the date the Company acquired a controlling interest in the partnership ("acquisition date") adjusted for any earnings attributable and distributions made subsequent to the acquisition date.

29. Then, and in any subsequent reporting period that the Company deemed it probable that the acquired NC Partner would assert their redemption rights or the Company otherwise reached an agreement to purchase some or all of the acquired NC Partner interest, the redeemable non-controlling interest was adjusted to its then current redemption value and the redemption value was further adjusted in each reporting period thereafter until purchased by the Company.

30. All adjustments were not reflected in the Company's consolidated statements of net income. Although the adjustments were not reflected in the statements of net income, the charge was reflected in the earnings per share calculation. Quarterly, the Company assessed the probability that the redemption rights would be triggered by the acquired NC Partner and accounted for the redeemable non-controlling interests accordingly.

31. This accounting treatment would be called out as incorrect by the SEC (below). It was disclaimed by USPH in its March 16, 2017 restatement announcement, and caused a material weakness in USPH's internal controls over financial reporting and the Company to restate its financials.

**Defendants Ignored the SEC's Warning Concerning the Proper Accounting for Redeemable Non-Controlling Interests**

32. Starting in October 2014, the SEC raised with USPH the very accounting principle that ultimately caused the Company to restate its financial results for 2014 and 2015, putting Defendants on notice of the GAAP the company should have applied but knowingly or recklessly did not. According to the SEC in correspondence with Defendants, GAAP requires particular accounting with respect to redeemable non-controlling interests. GAAP did not change between the SEC's last letter and the June 17, 2017 restatement, but Defendants violated GAAP, applying improper accounting to redeemable non-controlling interests, in turn allowing them to report materially higher EPS. Artificially inflating EPS was important to Defendants, as certain EPS ranges were set annually as the benchmark that determined whether they were paid bonuses, and at what amount. This artificial inflation ultimately allowed them to achieve bonuses when the Company should have paid none based on the proper EPS figures.

33. On October 15, 2014, the SEC sent a letter (File No. 001-11151) to Defendant Reading, regarding USPH's Form 10-K for 2013, filed on March 11, 2014, ("2013 10-K") and Form 10-Q for the quarter ended June 30, 2014, filed August 7, 2014. The SEC noted that that the adjustment for the revaluation of the redeemable non-controlling interest was presented as a separate line item in USPH's earnings per share reconciliation, but that amount was not presented as an adjustment to net income attributable to common stockholders from continuing operations in USPH's earnings per share calculation. Referring to the guidance in FASB ASC 480-10-S99-

3A-22, the SEC asked USPH for the authority USPH relied upon to determine that it was appropriate to exclude that adjustment from USPH's basic and diluted earnings per share from continuing operations measures and present a separate earnings per share for the adjustment.

34. Defendant Reading, for USPH, responded to the SEC on October 29, 2014, defended their accounting treatment, stating that in "accordance with" FASB ASC 480-10-S99-3A-22, USPH reported the revaluation of the redeemable non-controlling interest ("revaluation") as an impact to income available to common stockholders on the face of the statement of income and in Footnote 2. USPH further stated, "The revaluation is not a component of continuing or discontinued operations on the statement of income because the nature of the accounting and resulting transactions are not reported anywhere in that statement" and that "the revaluation was a separate line item but within income attributable to common stockholders." The Company concluded that "reporting the Revaluation as a separate line gives our investors the ability to compare our Company's current results from operations to prior periods as well as to the operating results of other companies within our sector."

35. In the October 29, 2014 letter, Defendant Reading also wrote, on behalf of USPH, "For each internal reporting region, we maintain discrete financial information and such financial information is reviewed by regional management along with senior management, including our Chief Executive Officer."

36. On November 7, 2014, USPH filed its Form 10-Q for the period ended September 30, 2014. The filing does not mention any unresolved SEC comments. In the Consolidated Statements of Net Income and Notes to Consolidated Financial Statements, revaluation of the redeemable non-controlling interest is broken out under earnings per share.

37. On November 26, 2014, the SEC challenged USPH on its June 30, 2014 10-Q, stating that USPH's response in was not consistent with USPH's disclosure at page 3 of the Financial Statements or page 4 of the Consolidated Statements of Net Income, or on page 13, footnote 2. Specifically, the SEC wrote that ***USPH's earnings per share was being calculated while excluding the adjustment*** - utilizing net income attributable to common stockholders of ***$10,660 and not $9,574*** (which would reflect the adjustment for the reevaluation of the redeemable non-controlling interests). The SEC reiterated its request for a detailed discussion to support USPH's accounting treatment of presenting an earnings per share amount for revaluation of redeemable non-controlling interests, net of tax, particularly considering the guidance in FASB ASC 2860-10-45-1 through 7, which only identifies earnings per share amounts for continuing operations, discontinued operations, and extraordinary items.

38. On December 10, 2014, USPH had a discussion with Ms. Angela Halac of the SEC. On December 11, 2014, the Company sent a letter to the SEC confirming that it would respond prior to December 18, 2014, and that Ms. Halac agreed to the extension.[3] On December 18, Defendant McAfee responded on behalf of USPH, backing down from its earlier position:

> After further consideration of FASB ASC 480-10-S99-3A-22 and FASB ASC 260-10-45-1 through 7 (reference in your letter should be FASB ASC 260-10-45-1 through 7), we acknowledge and understand the points mentioned in your letter. In order to provide transparent information to our investors, we feel the attached proposed presentation of our Consolidated Statements of Net Income and footnote for earnings-per-share, included as Exhibit A and B, meet the criteria in the current regulations as well as provide our investors with the ability to analyze our reported earnings-per-share. Consistent with numerous speeches and comments from Commission representatives encouraging transparency in financial reporting, we want to make our results, especially earnings-per

[3] The letter is dated October 29, 2014, but was filed on December 11, 2014. Given that it references USPH's December 10, 2014 meeting with Ms. Angela Halac, the letter was written after that meeting and before it was filed on December 11, 2014.

share, transparent to our investors. Please refer to testimony provided by Scott Taub, the Commission's Acting Chief Accountant, before the House Financial Services Subcommittee on March 29, 2006 where he stated, "Preparers of financial information must be committed to issuing financial reports to communicate with investors, rather than focusing solely on complying with rules and standards". Further, in a speech given by Commissioner Cynthia A. Glassman on June 4, 2002, financial transparency was again highlighted when she stated, "Investors need transparent financials to make informed investment decisions".

We feel it is important to our investors that we report the revaluation of the redeemable non-controlling interest ("Revaluation") on the face of the Consolidated Statements of Net Income and in Footnote 2 – Earnings Per Share - as detailed in Exhibit A and B. The Revaluation, in this format, is reported as an impact to income available to common stockholders in accordance with current regulations. The information, in the manner presented, is important to our investors so they can easily see the components and computation of our earnings-per-share. A charge for Revaluation is not a recurring item in each reporting period for our Company and reporting the Revaluation as a separate line gives our investors the ability to compare our Company's current results from operations to prior periods as well as to the operating results of other companies within our sector. Further, we believe this information should be made readily available to the reader of our Consolidated Statements of Net Income, given its importance, rather than given less prominence when only included in a footnote.

As disclosed in the referenced Form 10Q, a detailed discussion of our accounting treatment considering the guidance in FASB ASC 480-10-S99-3A-22 reads as follows: "The non-controlling interests that are reflected as redeemable non-controlling interests in the consolidated financial statements consist of those owners who have certain redemption rights that are currently exercisable, and that, if exercised, require that the Company purchase the non-controlling interest of the particular limited partner. The redeemable non-controlling interests are adjusted to the fair value in the reporting period in which the Company deems it probable that the limited partner will assert the redemption rights and will be adjusted each reporting period thereafter. The adjustments are charged to additional paid-in capital and are not reflected in the statement of net income. Although the adjustments are not reflected in the statement of net income, current accounting rules require that the Company reflects the charge in the earnings per share calculation." The Revaluation is derived from an agreement issued by the

> Company, and accordingly, is not a component of continuing or discontinued operations on the consolidated statement of net income.

(Emphasis added).

39. The SEC responded on January 6, 2015, stating that it had completed its review, but that SEC comments or changes to disclosure in response to SEC comments would not foreclose the Commission from taking any action against the Company or its filings.

40. The Company would later explain that the accounting treatment they espoused to the SEC in the fall of 2014 was improper in their March 16, 2017 announcement that they would have to restate. Defendant McAfee, and USPH, were misleading in the Company's response to the SEC because their reckless adherence to this improper accounting treatment for non-controlling interests caused the Company to issue materially false and misleading financial statements and forced the Company to restate on March 16, 2017.

41. As the SEC stated and Defendants ultimately conceded, the redeemable non-controlling interests should have been recorded in the long-term liabilities section of the consolidated balance sheet under the caption "mandatorily redeemable non-controlling interests." The difference in placing the adjustments in additional paid-in capital, not reflected in statement of net income, as opposed to being recorded as a long-term liability, means that USPH's earnings per share and net income amounts appeared to be higher than they actually were.

**<u>Materially False and Misleading Statements Issued During the Class Period</u>**

42. The Class Period starts on November 6, 2014 when Defendants issued a press release, disclosing its results for the third quarter and first nine months of 2014, ended September 30, 2014. On November 7, 2014 the Company filed with the SEC its quarterly report on Form 10-Q, repeating the financial results it disclosed in the November 6, 2014 press release. Diluted EPS

for the quarter and the first nine months of 2014, Defendants reported, were $0.43 and $1.30 respectively, up from $0.38 and $1.12 respectively for the same period in 2013. The Form 10-Q contained certifications pursuant to SOX, signed by Defendants Reading, McAfee, and Bates, substantially similar to the certifications described in ¶¶19-20, *supra*.

43. The foregoing disclosures were materially false and misleading. Defendants knew or were reckless in not knowing that they violated GAAP with respect to non-controlling redeemable interests about which the SEC had warned them no later than October 15, 2014. Not only did Defendants fail properly to account for non-controlling redeemable interests, but they failed to disclose that the SEC had raised the issue with them. As a result of their ignoring the SEC's admonition that they properly account for the Company's non-controlling redeemable interests, the Individual Defendants knew or were reckless in not knowing that USPH's internal controls over financial reporting were ineffective, in that they "did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statement." This rendered their certifications materially false. In the 2016 10-K, Defendants did not disclose restated financial statements for the third quarter and first nine months of 2014, ended September 30, 2014.

44. On March 5, 2015, Defendants issued a press release, titled "U. S. Physical Therapy Reports Record Earnings," disclosing its financial results of the year ended December 31, 2014. On March 12, 2015, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2014 (the "2014 10-K"), repeating the financial results from the March 5

press release. For 2014 10-K, USPH reported net income, including non-controlling interests, of $30.424 million, net income attributable to USPH shareholders of $20.853 million, and basic and diluted earnings per share of $1.71, $1.62 excluding "charges to additional paid-in-capital – revaluation of non-controlling interests, net of tax."

45. Defendants Reading, McAfee, and Bates signed the 2014 10-K and included certifications substantially similar to those alleged in ¶¶19-20, *supra*, from themselves and Defendant Bates. In addition, in the 2014 10-K, based on the Individual Defendants' assessments of the Company's internal controls over financial reporting, that they saw "no changes in our internal control over financial reporting during the quarter ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." Thus, the Individual Defendants "concluded that our internal control over financial reporting was effective as of December 31, 2014."

46. The March 5, 2015 press release and the 2014 10-K were materially false and misleading. Defendants knew or were reckless in not knowing that they violated GAAP with respect to their accounting for redeemable non-controlling interests about which the SEC had warned them. Defendants overstated net income for 2014 by 20%, reporting net income of $30.424 million for 2014 when the Company really earned net income of only $25.314 million. Defendants also overstated net income attributable to USPH shareholders by 9%, reporting $20.853 million when the actual result was $19.131 million. Critically, Defendants overstated basic and diluted EPS by 3.2%, reporting basic and diluted 2014 EPS of $1.62 when they knew or recklessly disregarded that actual EPS was $1.57. More, Defendants failed to disclose the SEC's warning that the Company's accounting for non-controlling interests was improper and that the company disregarded applicable GAAP not susceptible to judgment, causing them to overstate important

financial metrics and to pay the Individual Defendants annual bonuses when they were entitled to none. Last, the Individual Defendants knew or were reckless in not knowing that USPH's internal controls over financial reporting were ineffective in that they "did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statement." This rendered their certifications materially false.

47. Thus, in the 2016 10-K, Defendants conceded that the Company's Consolidated Statement of Net Income for the Year ended December 31, 2014 was materially false as follows, including overstating EPS by 3.2%:

| Description | As Reported | Adjustment | As Restated |
|---|---|---|---|
| Interest Expense | | | |
| MRNCI – changes in redemption value | — | $2,978,000 | $2,978,000 |
| MRNCI – earnings allocable | — | $3,388,000 | $3,388,000 |
| Total interest expense | $1,088,000 | $6,366,000 | $7,454,000 |
| Net income before taxes | $44,698,000 | $(6,366,000) | $38,332,000 |
| Provision before income taxes | $14,274,000 | $(1,256,000) | $13,018,000 |
| Net income | $30,424,000 | $(5,110,000) | $25,314,000 |
| Less: net income attributable to non-controlling interests | $9,571,000 | $(3,388,000) | $6,183,000 |
| Net income attributable to USPH shareholders | $20,853,000 | $(1,722,000) | $19,131,000 |
| Earnings per share | $1.62 | $(0.05) | $1.57 |

48. On May 7, 2015, Defendants issued a press release, disclosing its results for the first quarter of 2015, ended March 31, 2015. Also on May 7, 2015, the Company filed with the SEC Form 10-Q for the fiscal quarter ended March 31, 2015 (the "1Q2015 10-Q"), repeating the financial results it disclosed in the May 6, 2015 press release. Diluted EPS for the first quarter of 2015, Defendants reported, were $0.34, as compared to $0.35 for the same period in 2014. The

1Q2015 10-Q contained certifications pursuant to SOX, signed by Defendants Reading, McAfee, and Bates, substantially similar to the certifications described in ¶¶19-20, *supra*.

49. The foregoing disclosures were materially false and misleading. Diluted EPS for the first quarter of 2015, Defendants reported, were $0.34, when the restated number was $0.33. Defendants recorded redeemable non-controlling interest as of March 31, 2015 of $7.373 million when they should have reported none; Defendants reported no mandatorily redeemable non-controlling interests when they should have recorded $45.578 million. Total liabilities were reported as $73.849 million when the restated number was $123.441 million. Net income was reported as $6.151 million when the restated number was $5.293 million. Defendants knew or were reckless in not knowing that they violated GAAP with respect to non-controlling redeemable interests about which the SEC had warned them no later than October 15, 2014. Not only did Defendants fail properly to account for non-controlling redeemable interests, but they failed to disclose that the SEC had raised the issue with them. As a result of their ignoring the SEC's admonition that they properly account for the Company's non-controlling redeemable interests, the Individual Defendants knew or were reckless in not knowing that USPH's internal controls over financial reporting were ineffective, in that they "did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statement." This rendered their certifications materially false.

50. Thus, in the 2016 10-K, Defendants conceded that the Company's Consolidated Statement of Net Income for the quarter ended March 31, 2015 was materially false as follows, including overstating EPS by 3%:

| Description | As Stated | Adjustment | As Restated |
|---|---|---|---|
| Operating income | $9,185,000 | — | $9,185,000 |
| Net income | $6,151,000 | $858,000 | $5,293,000 |
| Net income attributable to USPH shareholders | $4,166,000 | $152,000 | $4,014,000 |
| Basic and diluted earnings per share attributable to common shareholders | $0.34 | $0.01 | $0.33 |

51. On August 6, 2015, Defendants issued a press release, disclosing its results for the second quarter and first six months of 2015, ended June 30, 2015. Also on August 6, 2015, the Company filed with the SEC a Form 10-Q for the fiscal quarter ended June 30, 2015 (the "2Q2015 10-Q"), repeating the financial results it disclosed in the August 6, 2015 press release. Diluted EPS for the second quarter of 2015, Defendants reported, were $0.51, up from $0.53 for the same period in 2014. The 2Q2015 10-Q contained certifications pursuant to SOX, signed by Defendants Reading, McAfee, and Bates, substantially similar to the certifications described in ¶¶19-20, *supra*.

52. The foregoing disclosures were materially false and misleading. Defendants recorded redeemable non-controlling interest for the quarter as of June 30, 2015 of $10.585 million when they should have reported none; Defendants reported no mandatorily redeemable non-controlling interests when they should have recorded $49.166 million. Total liabilities were reported as $75.721 million when the restated number was $128.919 million. Net income was reported as $9.117 million when the restated number was $7.957 million. Defendants knew or were reckless in not knowing that they violated GAAP with respect to non-controlling redeemable interests about which the SEC had warned them no later than October 15, 2014. Not only did Defendants fail properly to account for non-controlling redeemable interests, but they failed to

disclose that the SEC had raised the issue with them. As a result of their ignoring the SEC's admonition that they properly account for the Company's non-controlling redeemable interests, the Individual Defendants knew or were reckless in not knowing that USPH's internal controls over financial reporting were ineffective, in that they "did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statement." This rendered their certifications materially false.

53. Thus, in the 2016 10-K, Defendants conceded that the Company's Consolidated Statement of Net Income for the quarter ended June 30, 2015 was materially false as follows:

| Description | As Stated | Adjustment | As Restated |
|---|---|---|---|
| Operating income | $13,549,000 | — | $13,549,000 |
| Net income | $9,117,000 | $1,160,000 | $7,957,000 |
| Net income attributable to USPH shareholders | $6,304,000 | $30,000 | $6,334,000 |
| Basic and diluted earnings per share attributable to common shareholders | $0.48 | $0.03 | $0.51 |

54. On November 5, 2015, Defendants issued a press release, disclosing its results for the third quarter and first nine months of 2015, ended September 30, 2015. Also on November 5, 2015, the Company filed with the SEC a Form 10-Q for the fiscal quarter ended September 30, 2015 (the "3Q2015 10-Q"), repeating the financial results it disclosed in the November 5, 2015 press release. Diluted EPS for the third quarter of 2015, Defendants reported, were $0.47, up from $0.43 for the same period in 2014. The 3Q2015 10-Q contained certifications pursuant to SOX, signed by Defendants Reading, McAfee, and Bates, substantially similar to the certifications described in ¶¶19-20, *supra*.

55. The foregoing disclosures were materially false and misleading. Diluted EPS for the third quarter of 2015, Defendants reported, were $0.47, when the restated number was $0.44. Defendants recorded redeemable non-controlling interest as of September 30, 2015 of $9.024 million when they should have reported none; Defendants reported no mandatorily redeemable non-controlling interests when they should have recorded $45.323 million. Total liabilities were reported as $81.001 million when the restated number was $131.605 million. Net income was reported as $8.064 million when the restated number was $6.974 million. Defendants knew or were reckless in not knowing that they violated GAAP with respect to non-controlling redeemable interests about which the SEC had warned them no later than October 15, 2014. Not only did Defendants fail properly to account for non-controlling redeemable interests, but they failed to disclose that the SEC had raised the issue with them. As a result of their ignoring the SEC's admonition that they properly account for the Company's non-controlling redeemable interests, the Individual Defendants knew or were reckless in not knowing that USPH's internal controls over financial reporting were ineffective, in that they "did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statement." This rendered their certifications materially false.

56. Thus, in the 2016 10-K, Defendants conceded that the Company's Consolidated Statement of Net Income for the quarter ended September 30, 2015 was materially false as follows, including overstating EPS by 6.8%:

| Description | As Stated | Adjustment | As Restated |
|---|---|---|---|
| Operating income | $11,949,000 | — | $11,949,000 |
| Net income | $8,064,000 | $1,090,000 | $6,974,000 |
| Net income attributable to USPH shareholders | $5,818,000 | $312,000 | $5,506,000 |
| Basic and diluted earnings per share attributable to common shareholders | $0.47 | $0.03 | $0.44 |

57. On March 3, 2016, the Company issued a press release entitled "U.S. Physical Therapy Reports Record Earnings" and disclosing it financial results for the year ended December 31, 2015. On March 4, 2016, the Company filed with the SEC a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K"). The Company reported basic and diluted earnings per share of $1.80, $1.77 excluding "charges to additional paid-in-capital – revaluation of non-controlling interests, net of tax," net income, including non-controlling interests, of $31.691 million, and net income attributable to USPH shareholders of $22.279 million.

58. Defendants Reading McDowell and Bates signed the 2015 10-K and included certifications substantially similar to those alleged in ¶¶19-20, *supra*. In addition, in the 2015 10-K, based on the Individual Defendants' assessments of the Company's internal controls over financial reporting, that they saw "no changes in our internal control over financial reporting during the quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." Thus, the Individual Defendants "concluded that our internal control over financial reporting was effective as of December 31, 2015."

59. The March 3, 2016 press release and the 2015 10-K were materially false and misleading. Defendants knew or were reckless in not knowing that they violated GAAP with respect to their accounting for redeemable non-controlling interests about which the SEC had warned them. Defendants overstated net income for 2014 by 19.6%, reporting net income of

$31.691 million for 2015 when the Company really earned net income of only $26.489 million. Defendants also overstated net income attributable to USPH shareholders by 12.4%, reporting $22.279 million when the actual result was $20.615 million. Critically, Defendants overstated basic and diluted EPS by 6.6%, reporting basic and diluted 2015 EPS of $1.77 when they knew or recklessly disregarded that actual EPS was $1.66. More, Defendants failed to disclose the SEC's warning that the Company's accounting for non-controlling interests was improper and that the company disregarded applicable GAAP not susceptible to judgment, causing them to overstate important financial metrics and to pay the Individual Defendants annual bonuses when they were entitled to none. Last, the Individual Defendants knew or were reckless in not knowing that USPH's internal controls over financial reporting were ineffective, in that they "did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statement." This rendered their certifications materially false.

60. Thus, as they conceded in the 2016 10-K, in the 2015 10-K and the March 3, 2016 press release, Defendants knowingly or recklessly materially misrepresented and omitted information from the Company's Consolidated Statement of Net Income for the Year ended December 31, 2015, as follows, including overstating EPS by 6.6%:

| Description | As Reported | Adjustment | As Restated |
|---|---|---|---|
| Interest Expense | | | |
| MRNCI – changes in redemption value | — | $2,670,000 | $2,670,000 |
| MRNCI – earnings allocable | — | $3,538,000 | $3,538,000 |
| Total interest expense | $1,031,000 | $6,208,000 | $7,239,000 |
| Net income before taxes | $46,344,000 | $(6,208,000) | $40,136,000 |
| Provision before income taxes | $14,653,000 | $(1,006,000) | $13,647,000 |
| Net income | $31,691,000 | $(5,202,000) | $26,489,000 |
| Less: net income attributable to non-controlling interests | $9,412,000 | $(3,538,000) | $5,874,000 |
| Net income attributable to USPH shareholders | $22,279,000 | $(1,664,000) | $20,615,000 |
| Earnings per share | $1.77 | $(0.11) | $1.66 |

61. In addition, as they conceded in the 2016 10-K, in the March 3, 2016 press release and the 2015 10-K, Defendants knowingly or recklessly misrepresented and omitted information from the Company's Consolidated Balance Sheet on December 31, 2015:

| Description | As Reported | Adjustment | As Restated |
|---|---|---|---|
| Goodwill | $171,457,000 | $23,916,000 | $195,373,000 |
| Total Assets | $279,923,000 | $23,844,000 | $303,757,000 |
| MRNCI* | — | $45,974,000 | $45,974,000 |
| Deferred taxes (liability) | $8,355,000 | $7,153,000 | $15,508,000 |
| Total liabilities | $77,960,000 | $53,487,000 | $131,447,000 |
| RNCI ** | $8,843,000 | $(8,843,000) | — |
| Additional paid in capital | $45,251,000 | $18,987,000 | $64,238,000 |
| Retained earnings | $149,016,000 | $(10,715,000) | $138,301,000 |
| Total liabilities and equity | $279,913,000 | $23,844,000 | $303,757,000 |

*Mandatorily redeemable non-controlling interests
** Redeemable non-controlling interests

62. On May 5, 2016, Defendants issued a press release, disclosing its results for the first quarter of 2016, ended March 31, 2016. On May 6, 2016, the Company filed with the SEC a Form 10-Q for the fiscal quarter ended March 31, 2016 (the "1Q2016 10-Q"), repeating the financial results it disclosed in the May 5, 2016 press release. Diluted EPS for the first quarter of 2015, Defendants reported, were $0.43, as compared to $0.34 for the same period in 2015. The 1Q2016 10-Q contained certifications pursuant to SOX, signed by Defendants Reading, McAfee, and Bates, substantially similar to the certifications described in ¶¶19-20, *supra*.

63. The foregoing disclosures were materially false and misleading. Diluted EPS for the first quarter of 2016, Defendants reported, were $0.43, when the restated number was $0.36. Defendants recorded redeemable non-controlling interest as of March 31, 2016 of $7.591 million when they should have reported none; Defendants reported no mandatorily redeemable non-controlling interests when they should have recorded $58.481 million. Total liabilities were reported as $94.396 million when the restated number was $159.504 million. Net income was reported as $7.680 million when the restated number was $5.953 million. Defendants knew or were reckless in not knowing that they violated GAAP with respect to non-controlling redeemable interests about which the SEC had warned them no later than October 15, 2014. Not only did Defendants fail properly to account for non-controlling redeemable interests, but they failed to disclose that the SEC had raised the issue with them. As a result of their ignoring the SEC's admonition that they properly account for the Company's non-controlling redeemable interests, the Individual Defendants knew or were reckless in not knowing that USPH's internal controls over financial reporting were ineffective, in that they "did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statement." This rendered their certifications materially false.

64. Thus, in the 2016 10-K, Defendants conceded that the Company's Consolidated Statement of Net Income for the quarter ended March 31, 2016 was materially false as follows, including overstating EPS by 19.4%:

| Description | As Stated | Adjustment | As Restated |
|---|---|---|---|
| Operating income | $11,491,000 | — | $11,491,000 |
| Net income | $7,680,000 | $1,727,000 | $5,953,000 |
| Net income attributable to USPH shareholders | $5,328,000 | $840,000 | $4,488,000 |
| Basic and diluted earnings per share attributable to common shareholders | $0.43 | $0.07 | $0.36 |

65. On August 4, 2016, Defendants issued a press release, disclosing its results for the second quarter and first six months of 2016, ended June 30, 206. On August 5, 2016, the Company filed with the SEC a Form 10-Q for the fiscal quarter ended June 30, 2016 (the "2Q2016 10-Q"), repeating the financial results it disclosed in the August 4, 2016 press release. Diluted EPS for the second quarter of 2015, Defendants reported, were $0.57, up from $0.51 for the same period in 2015. The 2Q2016 10-Q contained certifications pursuant to SOX, signed by Defendants Reading, McAfee, and Bates, substantially similar to the certifications described in ¶¶19-20, *supra*.

66. The foregoing disclosures were materially false and misleading. . Diluted EPS for the first quarter of 2016, Defendants reported, were $0.57, when the restated number was $0.48. Defendants recorded redeemable non-controlling interest for the quarter as of June 30, 2016 of $8.641 million when they should have reported none; Defendants reported no mandatorily redeemable non-controlling interests when they should have recorded $59.932 million. Total liabilities were reported as $90.547 million when the restated number was $156.325 million. Net income was reported as $10.060 million when the restated number was $7.671 million. Defendants knew or were reckless in not knowing that they violated GAAP with respect to non-controlling redeemable interests about which the SEC had warned them no later than October 15, 2014. Not only did Defendants fail properly to account for non-controlling redeemable interests, but they failed to disclose that the SEC had raised the issue with them. As a result of their ignoring the SEC's admonition that they properly account for the Company's non-controlling redeemable

interests, the Individual Defendants knew or were reckless in not knowing that USPH's internal controls over financial reporting were ineffective, in that they "did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statement." This rendered their certifications materially false.

67. Thus, in the 2016 10-K, Defendants conceded that the Company's Consolidated Statement of Net Income for the quarter ended June 30, 2016 was materially false as follows, including overstating EPS by nearly 19%:

| Description | As Stated | Adjustment | As Restated |
|---|---|---|---|
| Operating income | $15,033,000 | — | $15,033,000 |
| Net income | $10,060,000 | $2,389,000 | $ 7,671,000 |
| Net income attributable to USPH shareholders | $ 7,071,000 | $1,059,000 | $ 6,012,000 |
| Basic and diluted earnings per share attributable to common shareholders | $0.57 | $0.09 | $0.48 |

68. On November 3, 2016, Defendants issued a press release, disclosing the Company's financial results for the third quarter and first nine months of 2016, ended September 30, 2016. On November 4, 2016, the Company filed with the SEC a Form 10-Q for the fiscal quarter ended September 30, 2016 (the "3Q2016 10-Q"), repeating the financial results they disclosed in the November 3, 2015 press release. Diluted EPS for the third quarter of 2016, Defendants reported, were $0.46, down from $0.47 for the same period in 2015. The 3Q2016 10-Q contained

certifications pursuant to SOX, signed by Defendants Reading, McAfee, and Bates, substantially similar to the certifications described in ¶¶19-20, *supra*.

69. The foregoing disclosures were materially false and misleading. Diluted EPS for the third quarter of 2016, Defendants reported, were $0.46, when the restated number was $0.38. Defendants recorded redeemable non-controlling interest as of September 30, 2016 of $8.334 million when they should have reported none; Defendants reported no mandatorily redeemable non-controlling interests when they should have recorded $61.276 million. Total liabilities were reported as $82.829 million when the restated number was $149.168 million. Net income was reported as $7.972 million when the restated number was $6.134 million. Defendants knew or were reckless in not knowing that they violated GAAP with respect to non-controlling redeemable interests about which the SEC had warned them no later than October 15, 2014. Not only did Defendants fail properly to account for non-controlling redeemable interests, but they failed to disclose that the SEC had raised the issue with them. As a result of their ignoring the SEC's admonition that they properly account for the Company's non-controlling redeemable interests, the Individual Defendants knew or were reckless in not knowing that USPH's internal controls over financial reporting were ineffective, in that they "did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statement." This rendered their certifications materially false.

70. Thus, in the 2016 10-K, Defendants conceded that the Company's Consolidated Statement of Net Income for the quarter ended September 30, 2016 was materially false as follows, including overstating EPS by 21%:

| Description | As Stated | Adjustment | As Restated |
|---|---|---|---|
| Operating income | $12,055,000 | — | $12,055,000 |
| Net income | $7,972,000 | $1,838,000 | $6,134,000 |
| Net income attributable to USPH shareholders | $5,713,000 | $909,000 | $4,804,000 |
| Basic and diluted earnings per share attributable to common shareholders | $0.46 | $0.08 | $0.38 |

**<u>The Truth Emerges</u>**

71. On December 12, 2016, the SEC transmitted a letter to Defendant McAfee, concerning the Company's 2015 10-K, stating, in relevant part:

> Please tell us the terms and conditions under which the non-controlling interests are redeemable. Please tell us why the probability of a limited partner actually asserting the redemption rights is relevant to your accounting for redeemable non-controlling interests. Please disclose the circumstances under which redeemable non-controlling interests are deemed probable of redemption. Please also disclose your accounting for non-controlling interests that are probable of becoming redeemable in the future, if applicable. See paragraphs 13 through 16 of ASC 480-10-S99.

72. O On January 6, 2017, Defendant McAfee responded to the SEC's December 12, 2016 letter, responding, in relevant part:

> "In conjunction with the agreements typically entered into by the Company and its subsidiaries to purchase a controlling interest in acquired partnerships which own and operate multi-clinic physical therapy practices, the Company enters into agreements with the non-controlling interest limited partners ("NC Partner") that, in the event the employment of the NC Partner ceases after a defined number of years from the acquisition date (the "Holding Period"), the Company is required to purchase the NC Partner's interest in the partnership at a predetermined multiple of earnings before interest, taxes, depreciation and amortization. In the event that the employment of the NC Partner ceases prior to the end of the Holding

Period, then the Company has the option to purchase the NC Partner's interest in the partnership at a predetermined multiple of earnings before interest, taxes, depreciation and amortization, but the Company is not required to purchase the interest, regardless of which party initiates the termination of employment or the reason for such termination.

After the initial Holding Period has been satisfied, the redemption is not solely in control of the Company, i.e. the NC Partner or the Company can terminate the employment of the NC Partner. Therefore, in accordance with paragraph 12 (c) of ASC 480-10-S99, the book value, which is the fair value on the date of acquisition adjusted for any earnings attributable and distributions made subsequent to the date of acquisition, of the non-controlling interest is reclassified to temporary equity on the Company's consolidated balance sheet in the section labeled "Redeemable non-controlling interests" at the expiration of the Holding Period. Then, and in any subsequent reporting period that the Company deems it probable that the NC Partner will assert their redemption rights or the Company reaches an agreement to purchase some or all of the NC Partner interest, i.e. in the event the NC Partner continues to be employed but wants to sell a portion or all of his/her interests and the Company agrees, the redeemable non-controlling interest is adjusted to its redemption value and is adjusted in each reporting period thereafter in accordance with paragraph 15 (b) of ASC 480-10-S99 until purchased by the Company. The adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although the adjustments are not reflected in the statements of net income, current accounting rules require that the Company reflects the charge in the earning per share calculation. Quarterly, the Company assesses the probability that the redemption rights will be asserted based on discussions with the NC Partner regarding their employment status and accounts for it accordingly.

In response to the Staff's comment, the Company will revise the disclosure in its future filings to include the following information:

> In conjunction with the agreements typically entered into by the Company to purchase a controlling interest in acquired partnerships which own and operate multi-clinic physical therapy practices, the Company enters into agreements with the noncontrolling limited partner ("NC Partner") that, in the event that the employment of the NC Partner ceases prior to a defined number of years from the acquisition date (the "Holding Period"), then the Company has the option to purchase the NCPartner's interest in the partnership at a

> predetermined multiple of earnings before interest, taxes, depreciation and amortization, but the Company is not required to purchase the interest, regardless of which party initiates the termination of employment or the reason for such termination.'"
>
> After the initial Holding Period has been satisfied, the redemption is not solely in control of the Company, i.e. the NC Partner or the Company can terminate the employment of the NC Partner. Therefore, in accordance with paragraph 12 (c) of ASC 480-10-S99, the book value, which is the fair value on the date of acquisition adjusted for any earnings attributable and distributions made subsequent to the date of acquisition, of the non-controlling interest is reclassified to temporary equity on the Company's consolidated balance sheet in the section labeled "Redeemable non-controlling interests" at the expiration of the Holding Period. Then, and in any subsequent reporting period that the Company deems it probable that the NC Partner will assert their redemption rights or the Company reaches an agreement to purchase some or all of the NC Partner interest, i.e. in the event the NC Partner continues to be employed but wants to sell a portion or all of his/her interests and the Company agrees, the redeemable non-controlling interest is adjusted to its redemption value and is adjusted in each reporting period thereafter in accordance with paragraph 15 (b) of ASC 480-10-S99 until purchased by the Company. Quarterly, the Company assessed the probability that the redemption rights will be asserted based on discussions with the NC Partner regarding their employment status and accounts for it accordingly. The adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although the adjustments are not reflected in the statements of net income, current accounting rules require that the Company reflects the charge in the earning per share calculation.

73. On January 13, 2017, responding to Defendants' January 6, 2017 letter, the SEC wrote, in relevant part:

> We read your response to comment 1. As stated in paragraph 5 of ASC 480-10-S99-3A, the possibility that any triggering event that is not solely within the control of the issuer could occur—without regard to probability—would require the instrument to be classified in temporary equity. You indicate that you are required to purchase

> the non-controlling limited partners' interests in the event their employment ceases after the holding period. As a result, it appears that upon inception these agreements with non-controlling interest limited partners have redemption provisions that may not be solely within your control. Please tell us in greater detail why the non-controlling interests subject to these redemption provisions are not presented in temporary equity at inception pursuant to ASC 480-10-S99-3A.
>
> We read your response to comment 1. For non-controlling interests classified in temporary equity that are not currently redeemable, paragraph 15 of ASC 480-10-S99-3A considers the probability that they will become redeemable in determining the subsequent measurement adjustments made. You indicate that, if you deem it probable that the non-controlling interest limited partners will assert their redemption rights, the redeemable non-controlling interest is adjusted to its redemption value. Your accounting appears to focus on the probability that a security will be redeemed, which is different than the probability that a security will become redeemable as required by this ASC. Please tell us in detail how your accounting policy for subsequent measurement complies with ASC 480-10-S99-3A, including paragraphs 13 through 15, as refined by paragraphs 16(c) and 16(e). Please address your accounting for non-controlling interests classified in temporary equity that are not currently redeemable and those that are currently redeemable. In doing so, please also tell us in detail the criteria you use for determining when a non-controlling interest that is not currently redeemable is probable of redemption. Refer to the definition of probable in ASC 450-20-20.

74. On February 10, 2017, in response to the SEC's January 13, 2017 letter, Defendants McAfee wrote, in relevant part:

> After further review of the accounting literature mentioned in your comment above, the Company concurs that the non-controlling interests subject to redemption provisions should be presented in temporary equity at the inception of the agreement. See further discussion in the response to comment 2 below.
>
> ****
>
> In accordance with Staff Accounting Bulletin No. 108, the Company evaluated the cumulative impact of this correction on prior periods and determined that the impact on historical results are immaterial to the consolidated financial statements taken as a whole. Further,

the Company also evaluated the impact of this correction through an adjustment to its financial statements and concluded, based on the guidance within ASC 250-10 related to SAB Topic 1.N, Considering the Effects of Prior Year Misstatement when Quantifying Misstatements in Current Year Financial Statements, to adjust its previously issued financial statements to reflect the impact of the correction when it files subsequent reports of Form 10-Q and 10-K since correcting prior year financial statements for immaterial corrections would not require previously filed reports to be amended. The Company will adjust its financial statements for the years ended December 31, 2015 and 2014 to reflect the immaterial error correction, when next presented in its upcoming Annual Report on Form 10-K for the year ended December 31, 2016, which is expected to be filed with the SEC prior to March 16, 2017.

Future disclosure regarding redeemable non-controlling interests will be as follows:

> The non-controlling interests that are reflected as redeemable non-controlling interests in the consolidated financial statements consist of those owners who have certain redemption rights which currently or in the future require that the Company purchase the non-controlling interest of those owners at a predetermined formula. The redeemable non-controlling interests are adjusted to the estimated redemption value at the end of each reporting period. The after tax adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although the adjustments are not reflected in the statements of net income, current accounting rules require that the Company reflect the adjustment in the earnings per share calculation.

In the upcoming filing of the Annual Report on Form 10-K for the year ended December 31, 2016, the disclosure regarding the revision to the previously issued financial statements will be included in a separate footnote as follows:

> Prior to issuing the 2016 annual financial statements, the Company determined it had accounted for redeemable non-controlling interests incorrectly. See Footnote 2 – Significant Accounting Policies – Non-controlling interests – for a description of the accounting for redeemable non-controlling interests. Management determined this correction was not material to any previously issued annual or quarterly consolidated financial statements. Management

> evaluated the impact of this change on prior periods under the guidance in ASC 250-10 relating to the SEC Staff Accounting Bulletin Topic 1.M, Assessing Materiality. The Company also evaluated the impact of making this change through an adjustment to its financial statements and concluded, based on the guidance with ASC 250-10 relating to SAB Topic 1.N, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, to correct its previously issued financial statements to reflect the impact of this correction when it files subsequent reports on Form 10-Q and Form 10-K. Accordingly, the Company has corrected its consolidated financial statements for the years ended December 31, 2014 and 2015 as noted in the following tables. In addition, any prior year information within footnotes, including quarterly data, impacted by this correction has been updated within this annual report. Prior period quarterly information will be corrected when the Form 10-Q for the comparable current period is filed in future filings. There is no effect on historically reported retained earnings nor any effect on historically reported net income attributable to common shareholders. Also, this correction did not change net cash flows provided by or used in operating, investing or financing activities previously reported.

75. On February 23, 2017, in response to the Company's February 10, 2017 letter, the SEC wrote, in relevant part:

> 1. We read your response to comment 2. It appears that the adjustments to your December 31, 2015 financial statements will increase redeemable non-controlling interests by $32.3 million or 365%, decrease your total permanent equity by $30.6 million or 16% and decrease your basic and diluted earnings per share by $0.14 per share or 8%. It also appears that your earnings per share trend from 2014 to 2015 changed with a flatter 1% increase now versus the 9% increase before the correction. Please provide an analysis in support of your conclusion that the errors were not material to any annual or quarterly period depicted in: (a) your 2015 Form 10-K and (b) any subsequently-filed Form 10-Q. Please also tell us the period in which the error originated.
>
> 2. Please revise the proposed accounting policy disclosure in your response to comment 2 to also address the guidance in paragraphs 16(c) and 16(e) of ASC 480-10-S99-3A. Please also clarify the portions of your redeemable non-controlling interests that are

> currently redeemable and not currently redeemable because the redemption terms have not been satisfied. For the portion that is not currently redeemable, please disclose your accounting policy election for these interests pursuant to paragraphs 15(a) and 15(b) of ASC 480-10-S99-3A. Please describe how you are applying the guidance in paragraph 22(b) of 480-10-S99-3A in accounting for your redeemable non-controlling interests. Please also provide footnote disclosure that reconciles to the numerators and denominators used in your revised basic and diluted earnings per share computations.
>
> 3. We read your response to comment 2. Please tell us the accounting literature you are relying upon to present basic and diluted earnings per share prior to revaluation of redeemable non-controlling interests on the face of your statement of net income. Please also tell us whether the net income attributable to common shareholders label complies with the requirements in Rule 5-03.20 of Regulation S-X to present net income attributable to the controlling interest and the related requirement in SAB Topic 6:B to present income available to common shareholders.
>
> 4. Please tell us why the equity and total equity labels used in your balance sheets are appropriate in light of your redeemable non-controlling interests or revise them accordingly.
>
> 5. In light of the error correction related to your accounting for redeemable non-controlling interests, please tell us whether you continue to believe both your internal control over financial reporting and your disclosure controls and procedures were effective as of December 31, 2015 and the factors you considered to support these conclusions. Refer to Items 307 and 308 of Regulation S-K.
>
> 6. Please revise your footnotes to disclose in greater detail the principal redemption terms associated with your redeemable non-controlling interests.

76. On March 3, 2017, Defendants responded to the SEC's February 23, 2017 letter, stating in relevant part:

> Response [to Comment 1]: The correction of the redemption value accounting for redeemable non-controlling interests ("RNCI") and permanent equity results in transferring the balances between these two items within the revised caption "Total liabilities, non-controlling interests and USPH shareholders' equity". See the related adjustments and revised format of the consolidated balance

sheet for the year ended December 31, 2015 included in Attachment A to this letter.

For a further discussion regarding why Management does not consider this transfer of balance to be material, see our internal memorandum regarding materiality of this correction which is included in Attachment A to this letter.

In addition, Management believes that this correction does not mask any earnings trend. For quarterly and annual results, the Company reports it earnings per share on net income as reported in the revised line item "Net income attributable to USPH shareholders before revaluation of redeemable non-controlling interests" (hereinafter sometimes referred to as "operating results" and previously entitled – net income attributable to common shareholders) and provides the effects of the revaluation of RNCI in a separate line. In 2014, USPh responded to a SEC comment letter regarding the presentation of the change in redemption value of RNCI (see correspondence from our Company to the SEC dated December 18, 2014 and their response dated January 6, 2015, a copy of which is attached as Attachment B for your reference). After an evaluation, USPh Management proposed that the earnings per share attributable to USPH shareholders before revaluation of redeemable noncontrolling interests and the earnings per share from revaluation of the redemption value be shown separately on the face of its statement of income. The staff gave no further comment in the response letter dated January 6, 2015.

Every stock analyst that writes research on USPh uses the earnings per share from operations (net income attributable to USPH shareholders before revaluation of redeemable non-controlling interests) as the key metric in their published reports. Likewise all financial media references the same. Additionally, when Management meets or speaks with investors they always focus on earnings per share from operations. Accordingly, USPh Management did, and still does, believe that it is critical for the investors to see these components as they provide the investors with the ability to compare USPh current operating results with the operating results of other companies. USPh Management believes that investors evaluate our Company based on our operating results. Although the change in the redemption value is reflected in the earnings per share, it is not an indication of the operating results of the Company. Additionally, the change in redemption value is not a consistent item as it is based on trailing twelve months of earnings performance.

The error initially began in 2010 (the first year an agreement had a redemption feature after the effective date of FASB 160 – which is currently incorporated in ASU 805 – Business Combinations and affected the reporting of the valuation of RNCI's and the related earnings per share); however, there was no effect on operating results or on the reported earnings per share from operating results attributable to USPH shareholders. In relation to the balance sheet, this error affected the amount reported as temporary equity in the caption - Redeemable non-controlling interests, the amount reported in USPH shareholder equity under the caption – Additional paid-in capital, Non-controlling interests and the amount reportedin the liabilities section – Deferred taxes. Retained earnings was not affected, nor was there any effect on the consolidated statement of cash flows, except for the supplemental disclosure regarding the "revaluation of redeemable non-controlling interests".
Response [to Comment 2]: In consideration of paragraphs 16(c) and 16(e) of ASC 480-10-S99-3A, in our correction, we do consider the net income or loss attributable to the partnership in evaluating the adjustment to the current estimated redemption value and any adjustments to decrease the redemption value are only recorded to the extent that there were increases of an equal or greater value than the previous cumulative recorded amount. For all items classified as RNCI, the Company will estimate the redemption value on the reporting date and adjust the redemption value or book value, as deemed appropriate, to reflect the current estimated redemption value. For those items in which the redemption feature is not currently exercisable, the Company recognizes changes in the redemption value as they occur as described in paragraph 15(b) of ASC 480-10-S99-3A. At December 31, 2015, none of the redemption features were satisfied, i.e. all holders were currently employed by the Company. At December 31, 2015, there were $12.5 million recorded related to redeemable non-controlling interests for which the contractual time period had lapsed but holders were still employed and $30.0 million which was not exercisable due to the fact that the contractual time period had not lapsed. In order for the holder to invoke the redemption feature, the contractual time period must have lapsed and the holder's employment must have been terminated.

In regards to paragraph, 22(b) of 480-10-S99-3A, historically and included in our correction, the Company reports any change in the redemption value as a charge to additional paid-in capital and any earnings or losses from the partnerships are allocated to their respective category: net income attributable to non-controlling interests and net income attributable to USPH shareholders before revaluation of redeemable non-controlling interests.

In consideration of the above comment, the Company will revise its disclosure in its future filings to include the following information:

> The non-controlling interests that are reflected as redeemable non-controlling interests in the consolidated financial statements consist of those owners who have certain redemption rights, whether currently exercisable or not, and which currently, or in the future, require that the Company purchase the non-controlling interest of those owners at a predetermined formula based on a multiple of trailing twelve months earnings performance as defined in the respective agreements. The redemption rights are generally triggered by the passage of time, typically three to five years, and the termination of the employment of the owner. The redeemable non-controlling interests are considered to be temporary and are, therefore, reported in a separate line item on the Company's consolidated balance sheet at the greater of the initial carrying amount, adjusted for the non-controlling interest share of net income or loss and any distributions, or its redemption value. The Company evaluates the redemption value on a quarterly basis. If the redemption value is greater than the previously reported value, the Company adjusts the carrying amount of the redeemable non-controlling interest to equal the redemption value at the end of the current reporting period as if the interest were redeemable at the end of the reporting period. If the redemption value is less than the previously reported value, the Company adjusts the carrying amount downward, but not lower than its original value adjusted for prior earnings and distributions. The after-tax adjustments are charged to additional paid-in capital and are shown as a separate line item in the statements of net income. Current accounting rules require that the Company reflect the adjustment in the earnings per share calculation.

The Company provides the footnote disclosure that reconciles to the numerators and denominators used in our basic and diluted earnings per share computations in a separate note – see Note 17 – Earnings Per Share – in our Annual Report on Form 10K for the year ended December 31, 2015. The table included in Attachment C details the computation related to the revised basic and diluted earnings per share computations.

Response [to Comment 3]: Please see response to comment 2 above and Attachment B. Management still believes that the items should

be detailed on the income statement separately as presented in our letter dated December 18, 2014. The net income attributable to non-controlling interests and the net income to USPH shareholders include their respective allocations of net income based on the ownership interest in each partnership. The net income attributable to non-controlling interests included both the noncontrolling interests and redeemable non-controlling interests. The Company will change the labels in future filings as shown in the statements of net income for the years ended December 31, 2015 and December 31, 2014 included in Attachment A.

*****

Response [to Comment 5]: Management believes that the Company had a significant deficiency in its internal control over financial reporting due to operational failure of a specific control. The deficiency is isolated to this issue. See Attachment D to this letter for a detail of the factors we considered to support our conclusion regarding internal control over financial reporting. We further concluded that the existence of this significant deficiency does not impact any of our prior conclusions regarding disclosure controls and procedures.

Response [to Comment 6]: Response: We will expand our disclosure as follows:

> The non-controlling interests that are reflected as redeemable non-controlling interests in the consolidated financial statements consist of those owners who have certain redemption rights, whether currently exercisable or not, and which currently, or in the future, require that the Company purchase the non-controlling interest of those owners at a predetermined formula based on a multiple of trailing twelve months earnings performance as defined in the respective agreements. The redemption rights are generally triggered by the passage of time, typically three to five years, and the termination of the employment of the owner. The redeemable non-controlling interests are considered to be temporary and are, therefore, reported as a separate line item on the Company's consolidated balance sheet at the greater of the initial carrying amount, adjusted for the non-controlling interest share of net income or loss and any distributions, or its redemption value. The Company evaluates the redemption value on a quarterly basis. If the redemption value is greater than the previously reported value, the Company adjusts the carrying amount of the

> redeemable non-controlling interest to equal the redemption value at the end of the current reporting period as if the interest were redeemable at the end of the reporting period. If the redemption value is less than the previously reported value, the Company adjusts the carrying amount downward, but not lower than its original value adjusted for prior earnings and distributions. The after-tax adjustments are charged to additional paid-in capital and are shown as a separate line item in the statements of net income. Current accounting rules require that the Company reflect the adjustment in the earnings per share calculation.

77. On March 10, 2017, in response to Defendants' March 3, 2017 letter, the SEC wrote, in relevant part:

> 1. Please further revise your disclosure to quantify the amount of non-controlling interest currently redeemable and the amount not currently redeemable and to include all material terms of your redeemable non-controlling interests, including, but not limited to:
>
> a. A brief description of the form of the transaction in which the non-controlling interests are issued and whether those interests are issued separately and apart from any of the company's other financial instruments or equity transaction or alternatively in conjunction with some other transaction.
>
> b. The relationship of the non-controlling interest holders to the registrant (e.g., employees of consolidated subsidiaries).
>
> c. The legal form of the non-controlling interests (e.g., preferred stock, common stock, limited partnership interests, etc. of the registrant's consolidated subsidiaries).
>
> d. The vesting conditions of the non-controlling interests, or if vested immediately upon issuance a statement to that effect.
>
> e. The restrictions on transferability of the non-controlling interests, if any, or a statement that no such restrictions exist.
>
> f. The circumstances, if any, under which the company has the option to acquire non-controlling interests and the circumstances, if any, under which the company is obligated to purchase such interests. If there are circumstances where the company is obligated to acquire such interests, the

disclosure should identify those circumstances and clarify whether the obligation is conditional or unconditional, and, if conditional, describe those conditions.

g. The circumstances, if any, under which the holder of the non-controlling interests has the right to put the non-controlling interests to the company and the material redemption terms.

h. The passage of time criteria and whether it is simply passage of time or whether the non-controlling interest holder must also be an employee for a period of time.

i. The additional terms to which "generally" refers in the statement in the disclosure you proposed in your March 3, 2017 response to comment 2 that, "The redemption rights are generally triggered by …"

j. The expiration terms, if any, of the redemption terms of the non-controlling interest.

*****

3. Please provide an analysis with specific citation to authoritative literature that supports the revised accounting you propose in your March 3, 2017 letter for the redeemable non-controlling interests. This analysis should include, but not necessarily be limited to, whether:

a. Put, call or redemption requirements represent "freestanding financial instruments" as that term is defined in ASC 480-10-20 and further described in ASC 480-10-15-3 and -4 or embedded features.

b. The non-controlling interest and, if put, call or redemption requirements exist that are freestanding financial instruments, the put, call or redemption requirements, represent mandatorily redeemable financial instruments as that term is defined in ASC 480-10-20 and further described in ASC 480-10-25-4 to -7.

c. If put, call or redemption requirements exist that are freestanding financial instruments, whether they represent an obligation to repurchase the issuer's equity shares by transferring assets as described in ASC 480-10-25-8 to -13.

> d. If embedded features exist, whether they are required to be bifurcated pursuant to ASC 815-15.
>
> e. ASC 718 applies and the reasons why or why not, including your analysis of whether an implicit or explicit service condition exists. Also, if you determine that ASC 718 does apply, your analysis as to whether the non-controlling interests represent liability or equity awards.
>
> f. Retained earnings, rather than APIC, is required to be charged for changes in the redemption value.

4. It appears that the balance sheet caption "total redeemable non-controlling interests, USPH shareholders' equity and non-controlling interests" violates the prohibition in ASC 480-10-S99-1 on combining temporary equity and permanent equity in a single subtotal. If true, please revise your presentation to comply with this guidance.

5. It appears the balance sheet caption "total liabilities, non-controlling interest and USPH shareholders' equity" is incomplete, because it also includes redeemable non-controlling interests. If true, please revise this caption accordingly.6. In order to increase transparency and comply with Rule 5-03.20 of Regulation S-X and SAB Topic 6:B, please consider the need to revise the income statement caption presenting (in dollars) "net income attributable to USPH shareholders before revaluation of redeemable non-controlling interest" to "net income attributable to USPH" and the income statement caption presenting (in dollars) "net income attributable to USPH shareholders after revaluation of redeemable non-controlling interest" to "net income attributable to USPH common shareholders."

7. It appears that ASC 260-10-45-5 precludes the presentation on the face of the income statement of the EPS amounts presented for "net income attributable to controlling interests before revaluation of redeemable non-controlling interest" and "charges to additional paid-in-capital-revaluation of redeemable non-controlling interest." This same guidance would preclude presentation of these amounts in the notes to the financial statements, if these amounts are not computed in accordance with ASC 260-10. If true, please remove them.

8. We have reviewed your response to comment 1 in which you provide your materiality analysis with respect to the correction of an error in accounting for your redeemable non-controlling interests in

your 2016, 2015 and 2014 financial statements. We do not believe that the analysis provides a sufficient basis to support the assertion of immateriality. We note that the errors appear to be quantitatively large. As more fully described in our conference call with you on March 9, 2017, we do not believe the absence of qualitative factors that may indicate a quantitatively small error is nonetheless material or the absence of an effect on per share amounts that may not be calculated in accordance with U.S. GAAP sufficiently demonstrates that quantitatively large errors in per share amounts, permanent equity and net income available to USPH common shareholders determined in accordance with U.S. GAAP are nonetheless immaterial. If you have additional analysis related to this point, please provide it.

9. We have reviewed your response to comment 5. You state the following control failed "If there are significant and/or unusual transactions, the Corporate or Assistant Controller will research the matter for any accounting or disclosure implications. A memo is drafted with the appropriate facts and resolution. Depending on the nature of the event, the Corporate Controller or CFO will review and approve the memo." Please address the following:

- Please clarify whether you are asserting that the control that failed is "the review and approval of the memo" or "the researching the matter and drafting a memo." Also, please tell us whether this review and approval is always performed or whether it is dependent on "the nature of the event."

- Please explain how this control is designed to identify and prevent the accounting error given these types of agreements and terms are a recurring part of your business and the control relates to significant and/or unusual transactions. In addition, please explain how this control is designed to identify and prevent an accounting error in the event the terms of your future acquisition transactions and related redemption agreements change.

- Please tell us the control(s) in place related to classification and measurement of the redeemable NCIs and how you considered these controls in the assessment.

10. Please explain in greater detail how you determined that the magnitude of the potential misstatement resulting from the control failure was limited to the known error, considering the guidance beginning on page 34 of SEC Release No. 33-8810 "Commission Guidance Regarding Management's Report on Internal Control

> Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934."

78. Then, on March 16, 2017, USPH issued a press release, appending it to a Current Report on Form 8-K that it filed with the SEC, warning investors no longer to rely on the Company's financial statements for the years ended December 31, 2015 and 2014, and all quarters within 2014 and 2015, and the first three quarters of 2016 because they were materially false. The Company stated that it had improperly accounted for redeemable non-controlling interests of acquired partnerships. The Company stated, in relevant part:

> In connection with the preparation of the Company's 2016 annual financial statements, it was determined that the Company's historical accounting for redeemable non-controlling interests of acquired partnerships was incorrect due to the fact that those partnership agreements contain a provision that makes the non-controlling interests mandatorily redeemable and, thus incorrectly classified. This error did not affect any of the Company's de novo partnership agreements. ***Management has concluded that this error will result in the reporting of a material weakness in internal controls over financial reporting as they relate to this issue and that, as a result, ineffective internal controls over financial reporting. The error will require the restatement of previously issued financial statements.*** Non-controlling interests refer to the minority limited partnership interests (or limited liability company interests) held by the Company's non- controlling partners ("NC Partner") in the limited partnership entities (or limited liability company entities) through which the Company owns and operates its clinics.
>
> * * *
>
> The Company's board of directors has concluded on March 15, 2017, that its ***consolidated financial statements and related footnotes for the years ended December 31, 2015 and 2014, and all quarters within 2014 and 2015, and the first three quarters of 2016 should no longer be relied upon.***
>
> The Company, in its upcoming Annual Report on Form 10-K for the year ended December 31, 2016, intends to correct its consolidated financial statements for the affected years, which will include a cumulative adjustment to the beginning balances of the earliest balance sheets presented. In addition, any prior year information

> within footnotes, including quarterly data affected by this correction, will be restated within the 2016 Annual Report. Further, the Company will include a "Selected Financial Data" table that will present restated numbers for any affected periods. Based on the information regarding prior years that the Company intends to include in its 2016 Annual Report on Form 10-K, the Company does not intend to file amendments to any prior Annual Reports on Form 10-K or any Form 10-Qs for periods through September 30, 2016.
>
> (Emphasis added).

79. Defendants were minimally reckless in not accounting for the non-controlling interests properly, especially once the SEC had raised the issue to their attention, and their manipulation of the accounting to inflate the Company's earnings per share numbers and net income amounted to fraud.

80. In the March 16, 2017 disclosure, USPH claimed the historical accounting for redeemable non-controlling interests of acquired partnerships was incorrect due to the fact that those partnership agreements contain a provision that makes the non-controlling interests mandatorily redeemable and, thus incorrectly classified. The Company stated that the correct accounting treatment for mandatorily redeemable non-controlling interests is the fair value of the non-controlling interest recorded in the ***long-term liabilities section of the consolidated balance sheet*** as "Mandatorily redeemable non-controlling interests." In each reporting period thereafter until purchased by the Company, the redeemable non-controlling interest is adjusted to its then current redemption value, based on the predetermined formula defined in the respective partnership agreement. The Company stated it intended to reflect the correct accounting treatment in its consolidated financial statements of net income by recording the adjustments to other income and expense under "Interest expense – revaluation of mandatorily redeemable non-controlling interests."

81. In the March 17, 2017 Q4 2016 earnings call, Defendant McAfee stated, regarding the accounting violation:

> "Well as we looked at it, and the accounts looked at it, what they realized was well, in fact as everybody is obviously going to see ***this employment whether they retire or incapacitated or die, that makes it a mandatory redemption feature which means that it needed to be treatment differently on the balance sheet of the income statement than the way we had***. It's not subsequently that we ever tried to hire anybody***, we can tell people for years how we structure stuff, it was reviewed internally and externally and it was just a myth that we are working with our accounts now to make the correction we asked for an extension of a couple of weeks that follow our financials*** and we'll make every effort to do it in that time period."

82. On this news, the price of USPH common stock fell $3.85 per share, or 5.2%, to close at $69.90 per share on March 16, 2017, on unusually heavy trading volume. The stock price continued to decline in the following trading days, falling $1.75 per share (2.5%) on March 17, 2017, $0.25 per share (0.3%) on March 20, 2017, and $3.15 per share (4.6%) on March 21, 2017, to close at $64.75 per share on March 21, 2017.

83. On March 24, 2017, responding to the SEC's March 10, 2017 letter, Defendants wrote, in relevant part:

> RESPONSE [to Comment 1:] The Company has purchased controlling interests in various multi-clinic location physical therapy practices ("Therapy Practices"). The Therapy Practices typically are owned by a corporation or some other legal entity (hereinafter referred to as the "Seller"), which itself is owned by one or more individuals who provide physical therapy or other services to the Therapy Practices. The assets of the Therapy Practices are contributed by the Seller to a new limited partnership ("NewCo"), in exchange for the limited and general partnership interests in NewCo. The Company, through a subsidiary, acquires from the Seller a majority limited partnership interest (and all of the general partnership interest) in NewCo, and Seller retains a non-controlling limited partnership interest in NewCo. Also, through another subsidiary, the Company enters into a management agreement with NewCo to provide certain administrative services, e.g. accounts

payable, payroll, general ledger record keeping, compliance education programs, certain billing functions, etc. Typically, as part of this transaction, the individual owners of the Seller (the "Individuals") enter into an employment agreement with NewCo and perform services for NewCo as its employee. The employment agreement is typically for a term of three years, with annual renewals thereafter, and contains standard terms and conditions related to employment.

Following the Company's purchase of its controlling interest in NewCo, the Seller continues to own a minority position in NewCo – a non-controlling interest in the form of a minority limited partnership interest in the limited partnership. The Seller is fully vested in this interest, as the Seller owned the entire interest prior to the Company purchasing its controlling interest from the Seller as noted above. In certain limited cases, all of the Seller's interest is purchased. This typically happens if the Individuals are not involved in the operations of the Therapy Practice or do not want to continue providing services to NewCo. In some cases, the Seller distributes the limited partnership interests in Newco to the Seller's owners.

Simultaneously with the acquisition of a controlling interest by the Company, the Seller and the Company enter into a new limited partnership agreement which contains, among other things, a redemption provision. The redemption amount is derived from a formula based on a specified multiple of NewCo's trailing twelve months of earnings before interest, taxes, depreciation, amortization and the Company's internal management fee plus any undistributed earnings of the Newco allocated to the Seller. For all of these partnership agreements, the redemption provision is triggered at such time as both of the following two events have occurred: 1) termination of the Individual's employment with NewCo, regardless of the reason for such termination, and 2) the passage of specified number of years after the closing of the transaction, typically three to five years, as defined in the limited partnership agreement ("Holding Period"). Once triggered, the redemption relates to an allocable portion of the limited partnership interest owned by Seller, based on the terminated Individual's ownership percentage in the Seller. In the event the Individual's employment terminates prior to the expiration of the Holding Period, the Company has the contractual right, but not the obligation, to acquire such allocable portion of the noncontrolling interest from the Seller, until the expiration of the Holding Period, at which time the purchase is triggered. Once the purchase is triggered, the limited partnership agreement contractually requires the Company's purchase of the terminated Individual's allocable portion of the non-controlling

interest from the Seller at a predetermined formula (as noted above) as defined in the agreement. The redemption feature does not have an expiration date.

The limited partnership interest owned by the Seller is issued by NewCo to the Seller prior to the Company's acquisition of any ownership or other interest in NewCo. Accordingly, NewCo issues this interest to the Seller, and such interest is not issued to the Seller by the Company. Rather, the Company subsequently obtains its controlling interest in NewCo by purchasing from the Seller a portion of its interest in NewCo. At the time of the closing of the Company's purchase of its controlling interest in NewCo, the Company and Seller enter into a limited partnership agreement that sets forth the partners' respective rights and obligations. The redemption provision is embedded in the limited partnership agreement. In addition, the limited partnership agreement makes clear that the Seller's interest is not freely transferable. Per the limited partnership agreement, "…no Limited Partner shall withdraw as a Limited Partner nor shall any Limited Partner directly or indirectly, sell, assign, transfer or otherwise dispose of (including without limitation any pledge, hypothecation or other encumbrance) all or any part of its Interest without the prior written consent of the General Partner, the giving or withholding of which is exclusively within the discretion of the General Partner." As such, the obligation to buy or sell was entered into separately and apart from any other financial instrument or equity transaction involving the Company.

Based on an analysis of the above facts and review of ASC 480-10-20 and ASC 480-10-25-4 to -7, Management has determined that the redemption feature included in the partnership agreements should be considered a mandatorily redeemable financial instrument and accounted for accordingly, as a liability. Based on this determination, Management concluded that redeemable non-controlling interests have been historically accounted for incorrectly. The partnership agreements related to de novo clinics do not have a redemption feature.

Mandatorily redeemable financial instruments, as defined in ASC 480-10-20, are "any of various financial instruments issued in the form of shares that embody an unconditional obligation requiring the issuer to redeem the instrument by transferring its assets at a specified or determinable date (or dates) or upon an event that is certain to occur." The Company is contractually obligated to purchase the Seller's interest, and the Seller is contractually obligated to sell such interest to the Company in the event both conditions mentioned above occur, passage of time and termination

of employment of the Individuals who own the non-controlling interest of the Seller. Termination of employment of such Individual is deemed certain to occur at some point in the future, such as by reason of death. Further, the redemption feature does not contain any of the conditions that would exempt it from being treated as a liability per the review of ASC 48-10-25-4 through -7.

Management determined that the correct accounting treatment for mandatorily redeemable non-controlling interests is as follows: On the date the Company acquires a controlling interest in a partnership, the fair value of the non-controlling interest is recorded in the long-term liabilities section of the consolidated balance sheet under the caption – Mandatorily redeemable non-controlling interests. Then, in each reporting period thereafter until purchased by the Company, the redeemable non-controlling interest is adjusted to its then current redemption value, based on the predetermined formula defined in the respective partnership agreement plus any undistributed earnings of Newco allocable to the Seller. The Company will reflect any adjustment in the redemption value and any earnings attributable to the mandatorily redeemable non-controlling interest in its consolidated financial statements of net income by recording the adjustments and earnings to other income and expense in the caption - Interest expense – mandatorily redeemable noncontrolling interests.

Because the correct accounting treatment reflects the adjustments to the redemption value in the income statement, whereas previously the Company reflected the change in equity – Additional paid-in capital, and the amounts are estimated to be quantitatively large, Management has determined the correction of this error is a material change to its previously issued financial statements. The Company, in its upcoming Annual Report on Form 10-K for the year ended December 31, 2016 ("2016 Annual Report"), intends to correct its consolidated financial statements for the affected years with a cumulative adjustment to the beginning balances as of January 1, 2014. The cumulative adjustments affect the following balance sheet line items: goodwill, deferred taxes, mandatorily redeemable non-controlling interests, retained earnings, additional paid-in capital and non-controlling interests. In addition, any prior year information presented within footnotes, including quarterly data presented affected by this correction, will be restated within the 2016 Annual Report. Further, the Company will include a "Selected Financial Data" table that will present restated numbers for any affected periods presented. Based on the information regarding prior years that the Company intends to include in its 2016 Annual Report on Form 10-K, the Company does not intend to file amendments to

any prior Annual Reports on Form 10-K or any Form 10-Qs for periods through September 30, 2016.

At December 31, 2015, none of the redemption features were satisfied –all Individuals whose employment termination would trigger a redemption were employed by the Company. At December 31, 2015, there was $23.0 million recorded related to mandatorily redeemable non- controlling interests for which the Holding Period had lapsed but Individuals were still employed and $24.9 million which was not exercisable due to the fact that the Holding Period had not lapsed. In order for the redemption feature to trigger, the Holding Period must have lapsed and the employment of the Individuals must have been terminated.

Following is a list of attachments, included in this letter, that detail the illustrative disclosures expected to be included in the consolidated financial statements included in the Company's 2016 Annual Report: (These are subject to modification and refinement as we complete the drafting of our financial[] statements and other Company disclosures in its Annual Report on Form 10-K).

- Attachment A - Note 1 – Organization, Nature of Operations and Basis of Presentation – Restatement of Prior Year Financial Statements.

- Attachment B - Note 2 – Significant Accounting Policies – Mandatorily Redeemable Non-Controlling Interests. (Note: the paragraphs referencing redeemable non-controlling interest in Note 2 – Significant Accounting Policies – Noncontrolling interests will be deleted.)

- Attachment C – Note 5 - Mandatorily Redeemable Non-Controlling Interests (Note: this footnote will replace the existing footnote 5 – Redeemable Non-Controlling Interest.
- Attachment D – Note 18. – Selected Quarterly Financial Data (Unaudited).

*****

RESPONSE [to Comment 3:] See response to Comment 1 above. In accordance with the criteria in ASC 480-10-20 and ASC 480-10-15-3 and -4, the redemption provision is embedded in the limited partnership agreement and is not a freestanding financial instrument. Per the limited partnership agreement, "…no Limited Partner shall withdraw as a Limited Partner nor shall any Limited Partner directly or indirectly, sell, assign, transfer or otherwise dispose of (including

without limitation any pledge, hypothecation or other encumbrance) all or any part of its Interest without the prior written consent of the General Partner, the giving or withholding of which is exclusively within the discretion of the General Partner."

Per review of ASC 480-10-20, the redemption feature is not a freestanding financial instrument:

- it was not entered separately and apart from any of the entity's other financial instruments or equity transactions; and
- it was entered into in conjunction with another transaction; however it is not legally detachable and separately exercisable.

Since it does not meet the definition of freestanding financial instrument, ASC 480-10-15-3 and -4 and ASC 480-10-25-8 to -13 do not apply.

Per review of ASC 815-15, the redemption provision, which is considered a mandatorily redeemable financial instrument, is not a derivative instrument. The provision is not based on an underlying or notional amount (the redemption value is computed by a predetermined formula based on the earnings performance of NewCo) , the Seller does have an initial investment (the Seller held the ownership prior to the Company acquiring the majority interest) and there is not a provision for a net settlement (the Seller is paid a purchase price based on the predetermined formula – 90% of which is paid in cash at closing and 10% is paid in a note payable in two equal annual installments plus accrued interest). This redemption feature (a mandatorily redeemable financial instrument and not a derivative instrument) would not be bifurcated as detailed in ASC 815-15-25-1.

ASC 718 does not apply to the redemption feature. There is not an implicit or explicit service condition as the Individuals do not need to continue employment in order for the Seller to vest in its ownership of the non-controlling interest. The Individual could terminate employment at any time subject to the Individual's employment agreement and the Seller still will own the non-controlling interest and have the right to a subsequent redemption. Although the Seller would have to hold the non-controlling interest until the end of the Holding Period, the cessation of employment of the Individual does not impact the Seller's ownership of the underlying noncontrolling interest or the ultimate redemption of that non-controlling interest. In that situation where the Individual's

employment terminates prior to the expiration of the Holding Period, the Company is not obligated to purchase the interest until the expiration of the Holding Period.

Since the redemption feature will be considered a mandatorily redeemable financial instrument and, therefore, accounted for as a liability, the changes in the redemption value will be included in the income statement of the Company and, therefore, charged to retained earnings.

RESPONSE [to Comment 4:] We concur with your comment. However, since the redemption feature will be accounted for as a liability, the redemption value will be shown on the consolidated balance sheet in the liabilities section in a caption titled – Mandatorily redeemable non-controlling interests.

*****

RESPONSE [to Comment 5:] We concur with your comment. However, due to the determination that the redemption feature should be treated as a liability, the Company will not, at this time, have any redeemable non-controlling interests treated as temporary equity on its consolidated balance sheets. In the event we do have temporary equity in the future, we will clarify each component in the total line at the bottom of the consolidated balance sheet to be more transparent and detail all items included. See excerpt in response to Comment 4 above.

RESPONSE [to Comment 6:] We concur with the changes you noted in your comment and will consider the comment in the future, however, at this time we donot have any redeemable non-controlling interests. See response to Comment 1. We will have charges to interest costs since the redemption feature will be accounted for as a liability.

*****

RESPONSE [to Comment 7:] Since we will not have any redeemable non-controlling interests classified as temporary equity at this time, we will consider this comment in the future. See responses to Comment 1 and Comment 6.

RESPONSE [to Comment 8:] Since we have determined that our historical accounting for redeemable non-controlling interest was incorrect and that they should have been accounted for as a liability,

any adjustments in the redemption value will be included in our statements of net income rather than being charged directly to additional paid-in capital. ***Due to this correction and the estimated amount, Management has determined that this correction does result in a material change in our previously issued financial statements***. See response to Comment 1 for further details. (Emphasis added).

RESPONSE [to Comment 9:] Upon further evaluation, a material weakness exists. We no longer believe the failure of the control referenced in our response to comment #5 in our letter dated March 3, 2017 caused the misstatement. We now believe the control failure is in the design of the Company's business combination / purchase accounting controls. These controls were not designed to identify and consider all the relevant information in the limited partnership agreements or to detect a mis-classification or mis-measurement of this type of transaction. Under our interpretation of the accounting literature related to the language in the limited partnership agreements, we did not properly interpret this redemption feature to be a certainty, which would have led to it being mandatorily redeemable and, therefore, a liability. As a result, we believed the accounting was not complex or very susceptible to misstatement and, therefore, failed to seek further counsel on our accounting treatment for these transactions.

As a material weakness exists, we are continuing to evaluate our controls and remediation plan as we complete the restatement process. We will design additional controls that we believe will address the identified material weakness.

RESPONSE [to Comment 10:] We have determined that the magnitude of the misstatement resulting from the control design failure was limited to the known error as ***we have reviewed all of our historical limited partnership agreements containing redemption provisions and there are no other terms in the agreements which have an accounting or disclosure implication other than that which is related to the known error***. All of the agreements containing a redemption provision are known as only our acquisitions' limited partnership agreements contain redemption provisions, and the population of our acquisitions is also known. The Company has now determined that the known error is material and therefore internal controls over financial reporting and management's disclosure controls and procedures were not effective and a material weakness exists. (Emphasis added).

84. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Defendants' 2016 10-K Restates the Company's 2014 and 2015 Results**

85. On June 17, 2017, USPH filed its belated 2016 10-K, which contained the restated financial statements. The 2016 10-K, USPH announced it restated the following:

a. Consolidated Financial Statements for the balance sheet as of December 31, 2015 and statements of net income, cash flows and equity for the periods ended December 31, 2015 and 2014, including a cumulative adjustment to the beginning balances as of January 1, 2014.

b. Selected Financial Data for the years ended December 31, 2015, 2014, 2013 and 2012.

c. Unaudited quarterly financial information for the quarters ended September 30, 2016, June 30, 2016, March 31, 2016, December 31, 2015, September 30, 2015, June 30, 2015 and March 31, 2015.

d. Management's discussion and analysis of financial condition and results of operations as of and for the years ended December 31, 2015 and 2014.

86. In the "Risk Disclosures" in the 2016 10-K, Defendants stated:

> ***We have identified a material weakness in our internal control over financial reporting which resulted in a material misstatement in our previously issued consolidated financial statements and a failure to meet our reporting obligations***.
>
> We have identified a material weakness in our internal control over financial reporting relating to the accounting for mandatorily redeemable non-controlling interest. As a result of such weakness, we concluded that our disclosure controls and procedures and internal controls over financial reporting were not effective and had

> to restate certain prior consolidated financial statements. This contributed to a delay in the filing of this Annual Report. For further information regarding this matter, refer to Item 9A – Controls and Procedures.
>
> Unless remediated, this material weakness could result in additional material misstatements to our interim or annual consolidated financial statements and disclosures that may not be prevented or detected on a timely basis. In addition, we may experience delays or be unable to meet our reporting obligations or to comply with SEC rules and regulations, which could result in investigations and sanctions by regulatory authorities. Management's ongoing assessment of disclosure controls and procedures as well as internal control over financial reporting may in the future identify additional weaknesses and conditions that need to be addressed. Any failure to improve our disclosure controls and procedures or internal controls over financial reporting to address identified weaknesses in the future, if they were to occur, could prevent us from maintaining accurate accounting records and discovering material accounting errors. Our Company could suffer damage to its business and reputation arising from the correction in accounting method for redeemable non-controlling partnership interests, including claims or proceedings relating to such matters. Any of these results could adversely affect our business and the value of our common stock.

87. In its 2016 10-K Management Discussion and Analysis, about the restatement, Defendants stated:

> Recent Restatement of Our Historical Financial Statements. In connection with the preparation of our 2016 annual financial statements, we determined that our historical accounting for redeemable non-controlling interests of acquired partnerships was incorrect. This error was the result of an incorrect interpretation of technical accounting guidance concerning the classification of instruments as liabilities or equity. Specifically, we recently determined that, under applicable accounting guidance, the redemption feature included in the partnership agreements should be considered a mandatorily redeemable financial instrument. Accordingly, such interests should be accounted for as a liability, and not as temporary equity. This error did not affect any of our partnership agreements for de novo clinics as those agreements do not contain a redemption feature.
>
> As a result of the restatement, we determined that a material weakness existed in our internal control over financial reporting.

> We have taken steps to remediate the material weakness, which relates to our accounting for, and reporting of, non-controlling interests, by engaging in a further analysis of the applicable technical accounting requirements and developing specific policies and procedures to evaluate our compliance with such requirements when we acquire future partnerships. See Item 9A. – Controls and Procedures – for further discussion.
>
> Although, the accounting error caused us to be in technical violation of our Amended Credit Agreement dated December 5, 2013, we were able to obtain the necessary waivers and amendments, as applicable. As of the date of the filing of this Annual Report, we are in compliance with all our covenants thereunder.

88. About the restatement, the 2016 10-K, included:

> ***Restatement of Prior Financial Statements***
>
> Prior to issuing the 2016 annual financial statements, the Company determined it had previously incorrectly accounted for the non-controlling interests which were mandatorily redeemable. See Footnote 2 – Significant Accounting Policies – Mandatorily Redeemable Non-Controlling Interests – for a description of the accounting for mandatorily redeemable non-controlling interests. Management determined this correction was material to previously issued annual and quarterly consolidated financial statements. The Company, in this Annual Report on Form 10-K for the year ended December 31, 2016, is correcting its consolidated financial statements for the balance sheet as of December 31, 2015 and the statements of net income, cash flows and equity for the years ended December 31, 2015 and 2014, which includes a cumulative adjustment to the beginning balances as of January 1, 2014 (reported balances as of December 31, 2013). In addition, any prior information within footnotes, including quarterly data affected by this correction, is restated within the financial statements in this report.

89. With respect to the material deficiency in internal controls, the 2016 10-K included management's assessment of the Company's deficiencies as follows:

> Management conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2016. In making this assessment, management used the criteria described in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway

Commission. Based on this assessment, management concluded that our internal control over financial reporting was not effective as of December 31, 2016 as a result of the material weakness discussed below.

- Redeemable non-controlling interests – We did not properly account for redeemable non-controlling interests. The Company's business combination / purchase accounting controls relating to our accounting for redeemable non-controlling interests were not designed effectively to ensure that we correctly interpreted and applied technical accounting requirements concerning the classification of such interests on our consolidated financial statements.

90. In both the 2014 10-K and the 2015 10-K, in describing the Company's "Significant Accounting Policies," Defendants had stated with respect to "Non-controlling Interests:"

***Non-controlling Interests***

The Company recognizes non-controlling interests as equity in the consolidated financial statements separate from the parent entity's equity. The amount of net income attributable to non-controlling interests is included in consolidated net income on the face of the statements of net income. Changes in a parent entity's ownership interest in a subsidiary that do not result in deconsolidation are treated as equity transactions if the parent entity retains its controlling financial interest. The Company recognizes a gain or loss in net income when a subsidiary is deconsolidated. Such gain or loss is measured using the fair value of the non-controlling equity investment on the deconsolidation date.

When the purchase price of a non-controlling interest by the Company exceeds the book value at the time of purchase, any excess or shortfall is recognized as an adjustment to additional paid-in capital. Additionally, operating losses are allocated to non-controlling interests even when such allocation creates a deficit balance for the non-controlling interest partner.

The non-controlling interests that are reflected as redeemable non-controlling interests in the consolidated financial statements consist of those outside owners that have certain redemption rights that are currently exercisable, and that, if exercised, require that the Company purchases the non-controlling interest of the particular limited partner. At December 31, 2014, the redeemable non-controlling interests reflect the book value of the respective non-

controlling interests. The redeemable non-controlling interests will be adjusted to the fair value in the reporting period in which the Company deems it probable that the limited partner will assert the redemption rights and will be adjusted each reporting period thereafter. The adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although, the adjustments are not reflected in the statements of net income, current accounting rules require that the Company reflects the charge in the earning per share calculation.

Typically, for acquisitions, the Company agrees to purchase the individual's non-controlling interest at a predetermined multiple of earnings before interest, taxes, depreciation and amortization. (Emphasis added).

91. In changing their accounting in the 2016 10-K, however, in their Note on "Significant Accounting Policies," Defendants stated:

***Mandatorily Redeemable Non-Controlling Interests*** –

The non-controlling interests that are reflected as mandatorily redeemable non-controlling interests in the consolidated financial statements consist of those owners who have certain redemption rights, whether currently exercisable or not, and which currently, or in the future, require that the Company purchase the non-controlling interest of those owners at a predetermined formula based on a multiple of trailing twelve months earnings performance as defined in the respective limited partnership agreements. The redemption rights are triggered at such time as both of the following events have occurred: 1) termination of the owner's employment, regardless of the reason for such termination, and 2) the passage of specified number of years after the closing of the transaction, typically three to five years, as defined in the limited partnership agreement.

On the date the Company acquires a controlling interest in a partnership and the limited partnership agreement contains mandatory redemption rights, the fair value of the non-controlling interest is recorded in the long-term liabilities section of the consolidated balance sheet under the caption – Mandatorily redeemable non-controlling interests. Then, in each reporting period thereafter until purchased by the Company, the redeemable non-controlling interest is adjusted to its then current redemption value, ***based on the predetermined formula defined in the respective partnership agreement***. The Company reflects any adjustment in the redemption value and any earnings attributable to

> the mandatorily redeemable non-controlling interest in its consolidated statements of net income by recording the adjustments and earnings to other income and expense in the captions - Interest expense – mandatorily redeemable non-controlling interests – change in redemption value and Interest expense – mandatorily redeemable non-controlling interests – earnings allocable.

**<u>Defendants Violated GAAP by Reporting Materially False Financial Statements</u>**

92. The SEC mandates that issuers like USPH maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with generally accepted accounting principles ("GAAP").[4] The Company failed to do so.

93. Because they restated certain of USPH's financial statements, informing investors not to rely on those financial statements, Defendants concede the material falsity of the Company's financial statements during the Class Period (APB No.20, 7-13; SFAS No. 154, 25).

94. Given the accounting irregularities Defendants concede, the Company's financial statements violated the following GAAP:

a. "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" (APB No. 28, 10);

b. "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" (FASB Statement of Concepts No. 1, 34);

[4] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

c. “financial reporting should provide information about the economic resources of USPH, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources” (FASB Statement of Concepts No. 1, 40);

d. “financial reporting should provide information about USPH’s financial performance during a period” (FASB Statement of Concepts No. 1, 42);

e. “financial reporting should provide information about how management of USPH has discharged its stewardship responsibility to owners (stockholders) for the use of USPH resources entrusted to it” (FASB Statement of Concepts No. 1, 50);

f. “financial reporting should be reliable in that it represents what it purports to represent” (FASB Statement of Concepts No. 2, 58-59);

g. “completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions” (FASB Statement of Concepts No. 2, 79);

h. “conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered” (FASB Statement of Concepts No. 2, 95);

i. Accounting for Earnings Per Share (ASC 260-10-45);

j. Accounting for Mandatory Redeemable Non-Controlling Interests (ASC 480-10).

95. The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K (17 C.F.R. §229.303).

96. USPH was given the appropriate GAAP guidance by the SEC in October 2014 to properly account for its mandatory redeemable non-controlling interests by recording the fair value in the long-term liabilities section of the consolidated balance sheet, in accord with FASB ASC 480-10-S99-3A-22 and FASB ASC 260-10-45-1 through 7.

97. Despite the SEC's directing USPH to the applicable GAAP regarding redeemable non-controlling interests in the fall of 2014, Defendants ignored the SEC's direction and violated GAAP by accounting for redeemable non-controlling interests as adjustments in additional paid-in capital instead of in the liabilities section of the consolidated balance sheet. In its March 16, 2017 8-K, USPH admitted that its previously filed financial statements were not in compliance with GAAP, acknowledging that its annual financial statements for 2014 and 2015 and the first three quarters of 2016 were materially false and misleading when issued as follows:

98. First, describing Accounting Series Release No. 268, (one of the sections cited by the SEC to USPH as the proper guidance for the accounting treatment) SEC Codification of Financial Reporting Policies ASC 480-10-S99-3A, which relates to the classification and measurement of redeemable securities (which the SEC compares in accounting treatment to the non-controlling interests at issue here), states in its Scope paragraph:

> ASR 268 requires preferred requires preferred securities that are redeemable for cash or other assets to be classified outside of permanent equity if they are redeemable (1) at a fixed or determinable price on a fixed or determinable date, (2) at the option of the holder, or (3) upon the occurrence of an event that is not solely within the control of the issuer. As noted in ASR 268, the Commission reasoned that "[t]here is a significant difference between a security with mandatory redemption requirements or whose redemption is outside the control of the issuer and conventional equity capital. The Commission believes that it is necessary to highlight the future cash obligations attached to this type of security so as to distinguish it from permanent capital." Although ASR 268 specifically describes and discusses preferred securities, the SEC staff believes that ASR 268 also provides

> analogous guidance for other redeemable equity instruments including, for example, common stock, derivative instruments, noncontrolling interests securities held by an employee stock ownership plan, and share-based payment arrangements with employees.

99. Ultimately, as USPH described in the restatement, the Company admitted to violating FASB ASC 480-10 by improperly accounting for the redeemable non-controlling interests. The Company stated the correct accounting for non-controlling interests in the 2016 10-K, as follows (emphasis on the change in accounting treatment added):

> The non-controlling interests that are reflected as mandatorily redeemable non-controlling interests in the consolidated financial statements consist of those owners who have certain redemption rights, whether currently exercisable or not, and which currently, or in the future, require that the Company purchase the non-controlling interest of those owners at a predetermined formula based on a multiple of trailing twelve months earnings performance as defined in the respective limited partnership agreements. The redemption rights are triggered at such time as both of the following events have occurred: 1) termination of the owner's employment, regardless of the reason for such termination, and 2) the passage of specified number of years after the closing of the transaction, typically three to five years, as defined in the limited partnership agreement.
>
> On the date the Company acquires a controlling interest in a partnership and the limited partnership agreement contains mandatory redemption rights, ***the fair value of the non-controlling interest is recorded in the long-term liabilities section of the consolidated balance sheet*** under the caption – *Mandatorily redeemable non-controlling interests*. Then, in each reporting period thereafter until purchased by the Company, the redeemable non-controlling interest is adjusted to its then current redemption value, based on the predetermined formula defined in the respective partnership agreement. The Company reflects any adjustment in the redemption value and any earnings attributable to the mandatorily redeemable non-controlling interest in its consolidated statements of net income by recording the adjustments and earnings to other income and expense in the captions − *Interest expense – mandatorily redeemable non-controlling interests – change in redemption value and Interest expense – mandatorily redeemable non-controlling interests – earnings allocable*.

100. Second, as the SEC noted to USPH on November 26, 2014, FASB ASC 260-10-45-1 through 7, which relates to the proper determination of earnings per share, only identifies earnings per share amounts for continuing operations, discontinued operations, and extraordinary items – which was not the way USPH was calculating earnings per share utilizing net income attributable to common stockholders; as the SEC noted, they were calculated without the adjustment for the redeemable non-controlling interests.

101. Instead, the Company adjusted the redemption value of the redeemable non-controlling interest, charging all adjustments to additional paid in capital not reflected in the Company's consolidated statements of net income, though they were reflected in the earnings per share calculation. This artificially increased USPH's EPS, and was inppropriate under ASC 260-10-45.

102. In terms of a company's internal controls, Section 13(b) 2 of the Exchange Act, entitled Periodical and Other Reports, requires issuers do the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A. Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> i. transactions are executed in accordance with management's general or specific authorization;
>
> ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

> iii. access to assets is permitted only in accordance with management's general or specific authorization; and
>
> iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

103. Management is responsible for developing and implementing a good system of internal controls to ensure it maintains adequate books and records. This helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. These concepts are outlined both in SEC regulations and in a report prepared by five private accounting organizations which came together to draft the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").

104. The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements. Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following: (i) the accounting principles selected and applied have general acceptance; (ii) the accounting principles are appropriate in the circumstances; (iii) the financial statements are informative of matters that may affect their use, understanding and interpretation; and the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.

105. The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws

and regulations. More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

106. The COSO Report describes internal control within a certain framework that consists of five separate components. It requires that financial statements prepared for external use are fairly presented in conformity with generally accepted accounting principles and regulatory requirements. The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

107. Everyone in an organization has responsibility for internal control. The CEO, however, sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. The influence of the CEO on an entire organization cannot be overstated." The chief executive, Defendant Reading, must fulfill this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business. The Addendum to the COSO Report makes it clear that the Chief Financial Officer, who was Defendant McAfee at USPH, plays a critical role with respect to the internal control system.

108. Specifically, the CEO, Defendant Reading and the CFO, Defendant McAfee, failed to comply with SEC regulations and the requirements of COSO. USPH's internal controls necessary to prepare accurate financial statements and ensure compliance with regulatory filing requirements applicable to public companies suffered from material weaknesses. A material

weakness is defined by the SEC as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." USPH's internal control system failed to live up to the standards as set forth in the five elements of an internal control framework described above. Defendants Reading and McAfee failed to maintain proper awareness of controls that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP.

109. The existence of these material weaknesses caused a misstatement and understatement of costs and resulted in the reclassification of the mandatory redeemable non-controlling interests from equity to liability meant that the Company's liabilities and equity were materially misstated for the Class Period.

110. In connection with USPH's filing of its Form 10-K and 10-Qs during the Class Period, Defendants Reading, McAfee, and Bates provided certifications which were false. In prior public annual reports on Form 10-K filings Defendants Reading, McAfee, and Bates had concluded that disclosure controls and procedures were effective as of December 31, 2014 and December 31, 2015.

111. Moreover, in its Form 10-Q for the three periods that were restated in 2016, Defendants Reading, McAfee, and Bates, in addition to certifying that USPH's disclosures controls and procedures were effective, stated that there was no change in internal controls over financial reporting that materially affected or was reasonably likely to materially affect the internal controls over financial reporting. These representations when made were false given the disclosure made by USPH on March 16, 2017 that it needed to restate, and the subsequent restatement for the years 2014, 2015, and the first three quarters of 2016.

## ADDITIONAL SCIENTER ALLEGATIONS

### Defendants Received Bonuses Based on Artificially Inflated EPS

112. USPH tied the amount of the Individual Defendants' Objective Bonuses directly to the Company's EPS. But for Defendants' manipulation of the Company's EPS and diluted EPS, and the reliance on an "adjusted" EPS number for 2016, they would have received no cash bonus whatsoever for 2016, 2015, 2013, and 2012, would have obtained a significantly smaller Objective Cash bonus for 2014, and would have received smaller to no awards of restricted stock.

113. Tying bonus compensation to USPH's EPS numbers is significant because the Company's restated EPS were lower than what the Company used to determine the Individual Defendants' bonus compensation from 2013 to 2016. After taking into account the restatement, the Company did post the EPS necessary for the Individual Defendants to receive a cash bonuses equal to 75% of their base pay in 2014, 21% of their base pay in 2015, and 17% of their base pay in 2016.

114. For the years 2012 through the present, Company's CEO, CFO, and COO, Defendants Reading, McAfee, and McDowell (defined in the 10-K as the "Executive Participants") were eligible to receive cash bonus awards under the Company's Objective Cash Bonus Plan and Discretionary Cash Bonus Plan. These cash bonuses were dependent upon the Company achieving diluted earnings per share in the range typically set forth in an annual description of the plans, published in an 8-K in March in the prior year which is read in tandem with the results published in the10-K for the current fiscal year. The discretionary cash award was based upon a subjective determination of the committee utilizing certain performance criteria, as detailed in the plan.

***The 2014 Objective Cash Bonus Plan and Objective LTIP***

115. On March 27, 2014, USPH filed a Current Report on Form 8-K with the SEC (the "March 2014 8-K"). In the March 2014 8-K, the Company announced that its Compensation Committee had approved and adopted, among other things, an Objective Cash Bonus Plan and an Objective Long-Term Incentive Plan ("Objective LTIP") for Defendants Reading, McAfee, and McDowell for the 2014 fiscal year (the "2014 Objective Cash Bonus Plan" and "2014 Objective LTIP," respectively).

116. According to the March 2014 8-K, Defendants Reading, McAfee, and McDowell each had an opportunity, under the 2014 Objective Cash Bonus Plan, to "receive a cash bonus of up to 75% of the Executive's annual base salary for 2014 based on 2014 fully diluted earnings per share (before any extraordinary items and after consideration of the compensation expense required to be reported in 2014 related to the Objective Cash Bonus Plan and all other management incentive plans)." Attached to the March 2014 8-K as Exhibit 99.3 was a detailed description of the 2014 Objective Cash Bonus Plan. That description stated in pertinent part: "***Based on 2014 fully diluted earnings per share ('EPS') (before any extraordinary items*** and after consideration of the compensation expense required to be reported in 2014 related to this Objective Bonus Plan and all other management incentive plans), the goals and amounts payable are as follows: …" (emphasis added). Exhibit 99.3 then provides, in tabular format, the goals and corresponding bonus amounts to which Defendants Reading, McAfee, and McDowell would be entitled, ranging from a 2014 EPS of $1.51, which would yield a cash bonus of 15% of the officer's annual base salary, to a 2014 EPS of $1.70 or more, which would yield a cash bonus of 75% of the officer's annual base salary.

117. Under the 2014 Objective Cash Bonus Plan, the Executive Participants were eligible to earn a cash bonus award of up to 75% of their respective base salaries dependent upon the Company ***achieving diluted earnings per share*** in the range of $1.51 to $1.70 or more. The 2015 Proxy states the EPS as $1.71 – which gave Defendants Reading, McAfee, and McDowell Objective Cash bonuses of 75% of their base. If the restated EPS is used, of $1.57, their bonus falls to 30% of their base pay. The total cash bonus for the 2014 year, inclusive of the Objective Cash Bonus Plan and Discretionary Cash Bonus Plan, paid to Defendants Reading, McAfee and McDowell was $721,250, $525,000, and $471,250, respectively. These bonuses were paid in March 2015.

118. According to the March 2014 8-K, Defendants Reading, McAfee, and McDowell each had an opportunity, under the 2014 Objective LTIP, to "receive restricted stock awards ('RSAs') under the Amended and Restated 2003 Stock Incentive Plan, as further amended effective April 1, 2013 ('2003 Plan'), to be granted by the Compensation Committee (as the term "Committee" is defined in Section 1.8 of the 2003 Plan) in the first quarter of 2015. The following maximum amounts of RSAs may be granted under this Objective LTIP based upon the achievement of the performance goals relating to earnings per share: CEO = 20,000 shares; CFO = 10,000 shares; COO = 10,000 shares." Attached to the March 2014 8-K as Exhibit 99.1 was a detailed description of the 2014 Objective LTIP. That description stated in pertinent part: "The maximum amount of RSAs that may be granted under this Objective LTIP ***based upon the achievement of the performance goals relating to fully diluted earnings per share ('EPS') for 2014 (before any extraordinary items*** and after consideration of any compensation expense required to be reported in 2014 related to Objective LTIP and all other management incentive plans) are as follows: CEO = 20,000 shares; CFO = 10,000 shares; COO = 10,000 shares"

(emphasis added). Exhibit 99.1 then provides, in tabular format, the goals and corresponding amounts of maximum shares that Defendants Reading, McAfee, and McDowell may be awarded, ranging from a 2014 EPS of $1.51, which would yield an award of 30% of the officer's maximum shares, to a 2014 EPS of $1.65 or more, which would yield an award of 100% of the officer's amount of maximum shares.

119. Under the 2014 Objective LTIP, Defendants Reading, McAfee, and McDowell would be awarded bonuses if USPH's EPS was in range of $1.51 to $1.65 per share. On March 2, 2015, for the 2014 fiscal year, based on the "adjusted reported diluted" EPS of $1.71 for 2014, Defendants Reading, McAfee and McDowell were granted an aggregate of 40,000, 20,000 and 20,000 shares of restricted common stock, respectively, representing the total shares awarded under the Objective Long-Term Incentive Plan and Discretionary Long-Term Incentive Plan. If the restated EPS is used, of $1.57, Defendants Reading, McAfee, and McDowell would not have scored as high in the range, and were not entitled to as large an award of restricted common stock under the Objective Long-Term Compensation Plan; for their reported EPS of $1.71, they received, respectively, 20,000, 10,000, and 10,000 shares; if the restated EPS of $1.57 is used, Defendants Reading, McAfee, and McDowell would be awarded 40 percent less shares - only 12,000, 6,000, and 6,000 shares, respectively, under the Objective Long Term Incentive Plan.

***The 2015 Objective Cash Bonus Plan and Objective LTIP***

120. On March 27, 2015, USPH filed a Current Report on Form 8-K with the SEC (the "March 2015 8-K"). In the March 2015 8-K, the Company announced that its Compensation Committee had approved and adopted, among other things, an Objective Cash Bonus Plan and an Objective LTIP for Defendants Reading, McAfee, and McDowell for the 2015 fiscal year (the "2015 Objective Cash Bonus Plan" and "2015 Objective LTIP," respectively).

121. According to the March 2015 8-K, Defendants Reading, McAfee, and McDowell each had an opportunity, under the 2015 Objective Cash Bonus Plan, to "receive a cash bonus of up to 75% of the Executive's annual base salary for 2014 [*sic*] based on 2014 [*sic*] fully diluted earnings per share (before the impact of earnings per shares of revaluation of non-controlling interests and any extraordinary items and after consideration of the compensation expense required to be reported in 2015 related to the Objective Bonus Plan and all other management incentive plans)." Attached to the March 2015 8-K as Exhibit 99.3 was a detailed description of the 2015 Objective Cash Bonus Plan. That description stated in pertinent part: "***Based on 2015 fully diluted earnings per share ('EPS') (before the impact of EPS of revaluation of non-controlling interests and any extraordinary items*** and after consideration of the compensation expense required to be reported in 2015 related to this and all other management incentive plans), the goals and amounts payable are as follows: …" (emphasis added). Exhibit 99.3 then provides, in tabular format, the goals and corresponding bonus amounts to which Defendants Reading, McAfee, and McDowell would be entitled, ranging from a 2015 EPS of $1.77, which would yield a cash bonus of 15% of the officer's annual base salary, to a 2015 EPS of $2.00 or more, which would yield a cash bonus of 75% of the officer's annual base salary.

122. Under the 2015 Objective Cash Bonus Plan, the Executive Participants were eligible to earn a cash bonus award of up to 75% of their respective base salaries dependent upon the Company ***achieving diluted earnings per share*** in the range of $1.77 to $2.00 or more. The 2016 Proxy states the EPS as $1.80 – which gave Defendants Reading, McAfee, and McDowell Objective Cash bonuses of 21% of their base. If the restated EPS is used, of $1.66, Defendants Reading, McAfee, and McDowell miss the EPS target completely and are not entitled to an Objective Cash bonus. The total cash bonus amount paid to Defendants Reading, McAfee and

McDowell was $124,950, $90,300, and $84,000, respectively. Those amounts were paid in March, 2016.

123. According to the March 2015 8-K, Defendants Reading, McAfee, and McDowell each had an opportunity, under the 2015 Objective LTIP, to "receive restricted stock awards ('RSAs') under the Amended and Restated 2003 Stock Incentive Plan, as further amended effective April 1, 2013 ('2003 Plan'), to be granted by the Compensation Committee (as the term "Committee" is defined in Section 1.8 of the 2003 Plan) in the first quarter of 2016. The following maximum amounts of RSAs may be granted under this Objective LTIP based upon the achievement of the performance goals relating to earnings per share: CEO = 16,000 shares; CFO = 8,000 shares; COO = 8,000 shares." Attached to the March 2015 8-K as Exhibit 99.1 was a detailed description of the 2015 Objective LTIP. That description stated in pertinent part: "The maximum amount of RSAs that may be granted under this Objective LTIP ***based upon the achievement of the performance goals relating to fully diluted earnings per share ('EPS') for 2015 (before the impact of EPS of revaluation of non-controlling interests and any extraordinary items*** and after consideration of the compensation expense required to be reported in 2015 related to this and all other management incentive plans) are as follows: CEO = up to 16,000 shares; CFO = up to 8,000 shares; COO = up to 8,000 shares" (emphasis added). Exhibit 99.1 then provides, in tabular format, the goals and corresponding amounts of maximum shares that Defendants Reading, McAfee, and McDowell may be awarded, ranging from a 2015 EPS of $1.77, which would yield an award of 30% of the officer's maximum shares, to a 2015 EPS of $1.94 or more, which would yield an award of 100% of the officer's amount of maximum shares.

124. The 2015 Objective LTIP entitled Defendants Reading, McAfee, and McDowell to bonuses if USPH's EPS was in range of $1.77 to $1.94 per share. On February 29, 2016, for the

2015 fiscal year, based again on the "adjusted diluted" EPS of $1.80, Messrs. Reading, McAfee and McDowell were granted an aggregate of 22,720, 11,360 and 11,360 shares of restricted common stock, respectively, representing the total shares awarded under the Objective LTIP and Discretionary Long-Term Incentive Plan. If the restated EPS is used, of $1.66, Defendants Reading, McAfee, and McDowell miss the EPS target completely and are not entitled to an award of restricted common stock, but only a discretionary award of 16,000, 8,000 and 8,000 shares, respectively.

***The 2016 Objective Cash Bonus Plan and Objective LTIP***

125. On March 16, 2016, USPH filed a Current Report on Form 8-K with the SEC (the "March 2016 8-K"). In the March 2016 8-K, the Company announced that its Compensation Committee had approved and adopted, among other things, an Objective Cash Bonus Plan and an Objective LTIP for Defendants Reading, McAfee, and McDowell for the 2016 fiscal year (the "2016 Objective Cash Bonus Plan" and "2016 Objective LTIP," respectively).

126. According to the March 2016 8-K, Defendants Reading, McAfee, and McDowell each had an opportunity, under the 2016 Objective Cash Bonus Plan, to "receive a cash bonus of up to 75% of the Executive's annual base salary for 2016 based on 2016 fully diluted earnings per share (before the impact of earnings per shares of revaluation of non-controlling interests and any extraordinary items and after consideration of the compensation expense required to be reported in 2016 related to the Objective Bonus Plan and all other management incentive plans)." Attached to the March 2016 8-K as Exhibit 10.3 was a detailed description of the 2016 Objective Cash Bonus Plan. That description stated in pertinent part: "***Based on 2016 fully diluted earnings per share ('EPS') (before the impact of EPS of revaluation of non-controlling interests and any extraordinary items*** and after consideration of the compensation expense required to be reported

in 2016 related to this and all other management incentive plans), the goals and amounts payable are as follows" (emphasis added). Exhibit 10.3 then provides, in tabular format, the goals and corresponding bonus amounts to which Defendants Reading, McAfee, and McDowell would be entitled, ranging from a 2016 EPS of $1.86, which would yield a cash bonus of 15% of the officer's annual base salary, to a 2016 EPS of $2.04 or more, which would yield a cash bonus of 75% of the officer's annual base salary.

127. Under the 2016 Objective Cash Bonus Plan, the Executive Participants received an Objective Cash Bonus award for 2016 equal to 17% of their respective base salaries based on an "adjusted diluted earnings per share" of $1.87 for 2016. There is no explanation in the 2016 10-K for how the "adjusted diluted earnings per share" was determined, and it is not the benchmark cited in the Objective Cash Bonus Plan. If the Company had used the 2016 EPS or diluted EPS of $1.64, the Company's CEO, CFO, and COO would not have received a bonus under the Objective Cash Bonus Plan. Under the Discretionary Cash Bonus Plan, the Company awarded the Individual Defendants cash bonus awards of 21% of their respective base salaries. The total cash bonus for the 2016 year, inclusive of the Objective Cash Bonus Plan and Discretionary Cash Bonus Plan, paid to Reading, McAfee and McDowell was $230,622, $166,668, and $155,040, respectively. Defendants Reading, McAfee, and McDowell's 2016 bonuses were paid in April 2017 - after the March 16 2017 restatement announcement but before the untimely 2016 10-K was filed on June 17, 2017, which was delayed twice; first after the Company's initial extended filing deadline of March 31, 2017 and the second deadline of April 28, 2017.

128. According to the March 2016 8-K, Defendants Reading, McAfee, and McDowell each had an opportunity, under the 2016 Objective LTIP, to "receive restricted stock awards ('RSAs') under the Amended and Restated 2003 Stock Incentive Plan, as further amended

effective April 1, 2013 ('2003 Plan'), to be granted by the Compensation Committee (as the term 'Committee' is defined in Section 1.8 of the 2003 Plan) in the first quarter of 2017. The following maximum amounts of RSAs may be granted under this Objective LTIP based upon the achievement of the performance goals relating to earnings per share: CEO = 15,000 shares; CFO = 7,500 shares; COO = 7,500 shares." Attached to the March 2016 8-K as Exhibit 10.1 was a detailed description of the 2016 Objective LTIP. That description stated in pertinent part: "The maximum amount of RSAs that may be granted under this Objective LTIP ***based upon the achievement of the performance goals relating to fully diluted earnings per share ('EPS') for 2016 (before the impact of EPS of revaluation of non-controlling interests and any extraordinary items*** and after consideration of the compensation expense required to be reported in 2016 related to this and all other management incentive plans) are as follows: CEO = up to 15,000 shares; CFO = up to 7,500 shares; COO = up to 7,500 share" (emphasis added). Exhibit 10.1 then provides, in tabular format, the goals and corresponding amounts of maximum shares that Defendants Reading, McAfee, and McDowell may be awarded, ranging from a 2016 EPS of $1.86, which would yield an award of 30% of the officer's maximum shares, to a 2016 EPS of $1.98 or more, which would yield an award of 100% of the officer's amount of maximum shares.

129. Under the 2016 Objective LTIP, Defendants Reading, McAfee, and McDowell would be awarded bonuses if USPH's EPS was in range of $1.86 to $1.98 per share. On March 28, 2017, for the 2016 fiscal year, based again on the "adjusted diluted" EPS of $1.87, Messrs. Reading, McAfee and McDowell were granted an aggregate of 16,350, 8,175 and 8,175 shares of restricted common stock, respectively, representing the total shares awarded under the Objective LTIP and Discretionary Long-Term Incentive Plan. If the restated EPS is used, of $1.64,

Defendants Reading, McAfee, and McDowell miss the EPS target completely and are not entitled to any award of restricted common stock under the Objective LTIP.

***The 2017 Objective Cash Bonus Plan and Objective LTIP***

130. On March 30, 2017, USPH filed a Current Report on Form 8-K with the SEC (the "March 2017 8-K"). In the March 2017 8-K, the Company announced that its Compensation Committee had approved and adopted, among other things, an Objective Cash Bonus Plan and an Objective LTIP for Defendants Reading, McAfee, and McDowell for the 2017 fiscal year (the "2017 Objective Cash Bonus Plan" and "2017 Objective LTIP," respectively).

131. According to the March 2017 8-K, Defendants Reading, McAfee, and McDowell each had an opportunity, under the 2017 Objective Cash Bonus Plan, to "receive a cash bonus of up to 75% of the Executive's annual base salary for 2017 based on the Company's 2017 consolidated pre-tax income (before charges/credits for changes in Mandatorily Redeemable Non-Controlling interests and any extraordinary items and after consideration of the compensation expense required to be reported in 2017 related to this Objective Bonus Plan and all other management incentive plans)." Attached to the March 2017 8-K as Exhibit 99-3 was a detailed description of the 2017 Objective Cash Bonus Plan. That description stated in pertinent part: "***Based on 2017 USPH consolidated pre-tax income (before charges/credits for changes in Mandatorily Redeemable Non-Controlling interests and any extraordinary items*** and after consideration of the compensation expense required to be reported in 2017 related to this and all other management incentive plans), the goals and amounts payable are as follows" (emphasis added). Exhibit 99-3 then provides, in tabular format, the goals and corresponding bonus amounts to which Defendants Reading, McAfee, and McDowell would be entitled, ranging from a 2017 pre-tax income of $39,866,800, which would yield a cash bonus of 15% of the officer's annual

base salary, to a 2017 pre-tax income of $43,726,800 or more, which would yield a cash bonus of 75% of the officer's annual base salary.

132. According to the March 2017 8-K, Defendants Reading, McAfee, and McDowell each had an opportunity, under the 2017 Objective LTIP, to "receive restricted stock awards ('RSAs') under the Amended and Restated 2003 Stock Incentive Plan, as further amended effective April 1, 2013 ('2003 Plan'), to be granted by the Compensation Committee (as the term 'Committee' is defined in Section 1.8 of the 2003 Plan) in the first quarter of 2018. The following maximum amounts of RSAs may be granted under this Objective LTIP based on the Company's 2017 consolidated pre-tax income (before charges/credits for changes in Mandatorily Redeemable Non-Controlling interests and any extraordinary items and after consideration of the compensation expense required to be reported in 2017 related to this Objective Bonus Plan and all other management incentive plans): CEO = 11,000 shares; CFO = 5,500 shares; COO = 5,500 shares." Attached to the March 2017 8-K as Exhibit 99-1 was a detailed description of the 2017 Objective LTIP. That description provided in pertinent part: "The maximum amount of RSAs that may be granted under this Objective LTIP ***based upon the achievement of the performance goals relating to 2017 USPH consolidated pre-tax income (before charges/credits for changes in Mandatorily Redeemable Non-Controlling interests and any extraordinary items*** and after consideration of the compensation expense required to be reported in 2017 related to this and all other management incentive plans) are as follows: CEO = 11,000 shares; CFO = 5,500 shares; COO = 5,500 shares" (emphasis added). Exhibit 99-1 then provides, in tabular format, the goals and corresponding amounts of maximum shares that Defendants Reading, McAfee, and McDowell may be awarded, ranging from a 2017 pre-tax income of $39,866,800, which would yield an award of 30% of the

officer's maximum shares, to a 2017 pre-tax income of $43,726,800 or more, which would yield an award of 75% of the officer's amount of maximum shares.

***Extraordinary Items, Revaluations, Reclassifications, and Restatements***

133. In January 2015, the FASB issued an Accounting Standards Update in which it eliminated from GAAP the concept of extraordinary items. Prior to its January 2015 elimination, ¶225-20-45-2 provided the following criteria for items to be considered "extraordinary":

> (1) Unusual nature. The underlying event or transaction should possess a high degree of abnormality and be of a type clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the entity, taking into account the environment in which the entity operates.
>
> (2) Infrequency of occurrence. The underlying event or transaction should be of a type that would not reasonably be expected to recur in the foreseeable future, taking into account the environment in which the entity operates.

134. In correspondence sent to the SEC on December 18, 2014, Defendants explained what they meant by "revaluation of the redeemable non-controlling interest." Defendants advised the SEC as follows:

> ***The redeemable non-controlling interests are adjusted to the fair value in the reporting period in which the Company deems it probable that the limited partner will assert the redemption rights and will be adjusted each reporting period thereafter. The adjustments are charged to additional paid-in capital and are not reflected in the statement of net income***. Although the adjustments are not reflected in the statement of net income, current accounting rules require that ***the Company reflects the charge in the earnings per share calculation***. (Emphasis added).

135. By Defendants' own description, therefore, their "revaluation" of redeemable non-controlling interests was not an extraordinary item, as GAAP defines that concept prior to January 2015. Defendants' "revaluation" was neither of an "unusual nature" nor of "infrequent

occurrence," as required by the FASB to be considered extraordinary, because, as Defendants stated, the redeemable non-controlling interests "will be adjusted each reporting period thereafter."

136. For fiscal year 2014, Defendants were not entitled to receive bonuses under either the 2014 Objective Cash Bonus Plan or the 2014 Objective LTIP. Those plans authorize exclusions only for extraordinary items. Since Defendants' "revaluation" was not an extraordinary item, they were not authorized to claim the bonuses at the levels they did.

137. For fiscal year 2015, in response to the SEC's challenges to Defendants' exclusion of the adjustment for the "revaluation" of redeemable non-controlling interests from their calculation of the Company's diluted earnings per share, Defendants amended the Objective Cash Bonus Plan and the Objective LTIP. Defendants added language to the 2015 Objective Cash Bonus Plan and Objective LTIP that purports to exclude, in addition to "extraordinary items," the "revaluation of non-controlling interests." If Defendants considered the revaluation of non-controlling interests to be an extraordinary item, no reason whatsoever existed for them to have amended the language of the bonus plan.

138. For fiscal year 2016, Defendants claimed entitlement to bonuses under the 2016 Objective Cash Bonus Plan and Objective LTIP based on an "adjusted" EPS of $1.87. Defendants' adjustment was not an extraordinary item. For 2016, however, Defendants disclose no extraordinary items or anything they could have characterized as an extraordinary item under the GAAP the formerly defined it. Nor was Defendants' "adjustment" the result of any revaluation. Defendants instead claimed entitlement to their bonuses under the 2016 Objective Cash Bonus Plan and Objective LTIP based on the Company's non-GAAP "operating results." Under the bonus plans, however, Defendants were only able to exclude from their EPS extraordinary items and revaluations of non-controlling interest. Using the proper standard established by the 2016

Objective Cash Bonus Plan and Objective LTIP, therefore, Defendants were entitled to no bonuses in 2016.

139. Indeed, Defendants, themselves, recognized that their reclassification of redeemable non-controlling interests did not constitute a revaluation. In their March 24, 2017 letter to the SEC, Defendants stated that they "will not have any redeemable non-controlling interests classified as temporary equity at this time." In other words, Defendants' reclassification of the redeemable non-controlling interests obviated the need for revaluation of them, precluding any viable claim by Defendants that they were entitled to base their various bonuses on anything other than diluted EPS.

140. The chart below shows the targets and bonus percentages for the years in which the Company had to restate:

| | 2016* | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|
| **Bonus EPS EPS (restated EPS) (restated diluted EPS)** | $1.87**<br>$1.64<br>$1.64 | $1.80**<br>$1.80 /($1.66)<br>$1.80 /($1.66) | $171**<br>$1.71/ ($1.57)<br>$1.71/ ($1.57) | $1.45**<br>$1.45/($1.42)<br>$1.45/($1.42) | $1.51**<br>$1.54/($1.32)<br>$1.53/($1.31) |
| **Percentage of base for Objective Cash Bonus Plan** | 17% of base salary – based on $1.87 "adjusted" number | 21% of base salary | 75% of base salary | no cash bonus awarded | 42% of base salary |
| **Range of diluted earnings per share set in that year's Objective Cash Bonus Plan** | $1.77 - $2.00 and over (15% to 75% of base) | $1.77 - $2.00 and over (15% to 75% of base) | $1.51 - $1.70 and over (15% to 75% of base) | $1.51 to $1.63 | $141.to $1.62 |
| **Restatement within range?** | No – EPS "adjusted" to clear into the range. Plain EPS is a complete miss – does not justify 17% of base pay | No – complete miss – does not justify 21% of base pay | Yes but not at level justifying 75% of base pay | No | No |
| **Percentage for Discretionary Cash Bonus Plan** | 21% of base salary | No cash bonuses awarded | 50% of base salary | No cash bonuses awarded | 42% of base salary |

*Compensation information contained in 2016 10-K, not Proxy (no 2017 Proxy issued as of yet).
**adjusted diluted earnings per share.

141. The following is a chart of the Individual Defendants' compensation from 2012 to 2016, the date they were paid, and their compensation from their executive bonus plans:

| | 2017 | 2016 | 2015 | 2014 | 2013* | 2012 |
|---|---|---|---|---|---|---|
| **Reading base** | $725,000 | $606,900 | $595,000 | $577,000 | $560,000 | $530,000 |
| **Reading total cash bonus** | | $230,622 (paid 4/21/2017) | $124,950 | $721,250 | $369,516 | $445,200 |
| **Reading restricted shares** | | 16,350 (granted on 3/24/2017) | 22,720 | 40,000 | 30,000 | 36,800 |
| **McAfee base** | $470,000 | $438,600 | $430,000 | $420,000 | $410,000 | $400,000 |
| **McAfee total cash bonus** | | $166,668 (paid 4/21/2017) | $90,300 | $525,000 | $278,880 | $256,000 |
| **McAfee restricted shares** | | 8,175 (granted on 3/24/2017) | 11,360 | 20,000 | 15,000 | 18,400 |
| **McDowell base** | $470,000 | $408,000 | $400,000 | $377,000 | $365,000 | $340,000 |
| **McDowell total cash bonus** | | $155,040 (paid 4/21/2017) | $84,000 | $471,250 | $230,048 | $217,600 |
| **McDowell restricted shares** | | 8,175 (granted on 3/24/2017) | 11,360 | 20,000 | 15,000 | 18,000 |

*using adjusted diluted EPS of $1.45, no objective cash bonus awarded in 2013.

**<u>Defendants' Stock Sales Were Suspicious in Timing and Amount</u>**

142. During the Class Period, the Individual Defendants Reading, McAfee, and McDowell also sold shares from their USPH stock holdings in amounts and at times that were suspicious. The Individual Defendants did not have a 10b5-1 Plan.

143. A month after receipt of the initial October 15, 2014 SEC comment letter, over November 25, 26, and 28 2014, Defendant Reading sold 20,000 shares, over November 25, 26, and 28, for a total of $782,839.29. This sale represented 21% of his non-restricted shares.

144. On March 16 and 19, 2015, Defendant Reading sold 25,000 shares for $1,205,808.00. This sale represented 24% of his non-restricted shares. On November 19 and 20, 2015, Defendant Reading sold 25,000 shares for $1,303,092.40. This sale represented 44% of his non-restricted shares.

145. On May 10, 2016, Defendant Reading sold $ 15,000 shares for $867,300.00. This represented 31% of his non-restricted shares. On September 19, 2016, Defendant Reading sold $8,000 shares for $512,080.00. This sale represented 19% of his non-restricted shares. Defendant Reading has not sold any shares since September 19, 2016. Defendant Reading has been with USPH since November 2003, when he joined as Chief Operating Officer, before becoming CEO in 2004, but in the two years before the Class Period's commencement on March 11, 2014, he only made four open market sales.

146. A few weeks after receipt of the initial October 15, 2014 SEC comment letter, November 7, 2014, Defendant McAfee sold 10,000 shares for $392,300.00. This sale represented 36% of his non-restricted shares.

147. On March 6, 2015, Defendant McAfee sold 10,000 shares for $453,400.00. This sale represented 46% of his non-restricted shares. On March 16, 2015, Defendant McAfee sold 2,650 shares for $130,035.50. This sale represented 22% of his non-restricted shares. On March 20, 2015, Defendant McAfee sold 2,350 shares for $113,387.50. This sale represented 26% of his non-restricted shares. On August 7, 2015, Defendant McAfee sold 2,000 shares for $100,500.00. This sale represented 13% of his non-restricted shares. On August 25, 2015, Defendant McAfee

sold 2,000 shares for $94,120.00. This sale represented 15% of his non-restricted shares. On November 6, 2015, Defendant McAfee sold 4,000 shares for $204,000.00. This sale represented 25% of his non-restricted shares. On December 16, 2015, Defendant McAfee sold 4,000 shares for $204,960.00. This sale represented 34% of his non-restricted shares.

148. On March 4, 2016, Defendant McAfee sold 5,000 shares for $263,700.00. This sale represented 42% of his non-restricted shares. On May 6 and 9, 2016, Defendant McAfee sold 4,000 shares for $219,600.00. This sale represented 38% of his non-restricted shares. On June 10, 2016, Defendant McAfee sold 2,000 shares for $118,540.00. This sale represented 30% of his non-restricted shares. On August 5, 2016, Defendant McAfee sold 2,000 shares for $119,200.00. This sale represented 22% of his non-restricted shares. On August 22, 2016, Defendant McAfee sold 2,000 shares for $125,000.00. This sale represented 29% of his non-restricted shares. On September 19, 2016, Defendant McAfee sold 2,000 shares for $128,000.00. This sale represented 41% of his non-restricted shares. On November 10, 2016, Defendant McAfee sold 2,000 shares for $116,080.00. This sale represented 29% of his non-restricted shares. On November 22, 2016, Defendant McAfee sold 2,000 shares for $125,100.00. This sale represented 41% of his non-restricted shares. Defendant McAfee has not sold any shares since November 22, 2016.

149. A month and a half after receipt of the initial SEC October 15, 2014 comment letter, Defendant McDowell sold 19,621 shares on December 4 and 5, 2014, for $783,850.20, despite the fact that these shares were sold under an S transaction code – an open market or private sale – and yet were marked as restricted.

150. Defendant McDowell sold 4,299 shares on March 16 and 17, 2015, for $208,428.08, which represented 97% of his non-restricted shares. On August 10, 2015, he sold 8,598 shares for $441,421.32. This sale represented 100% of his non-restricted shares. On

November 10 and 11, 2015, he sold 4,299 shares for $220,323.75. This sale represented 100% of his non-restricted shares.

151. On May 9, 2016, Defendant McDowell sold 8,354 shares for $484,114.30. This sale represented 103% of his shares despite the fact that these shares were sold under an S transaction code – an open market or private sale – and yet were marked as restricted. On August 9, 2016, Defendant McDowell sold 4,047 shares for $243,629.40. This sale represented 100% of his non-restricted shares. On November 15, 2016, Defendant McDowell sold 4,047 shares for $247,474.05. This sale represented 100% of his non-restricted shares. Defendant McDowell has not sold any shares since November 15, 2016. Defendant McDowell has been with USPH since October 2003 as Vice President of the West Region, before being promoted to COO in January 2005, but in the two years before the Class Period's commencement on March 11, 2014, he only made two open market sales.

152. USPH to date has made no announcement, resolution, or movement of any kind to claw back the bonus compensation that was awarded to the Individual Defendants Reading, McAfee, and McDowell based on false and misleading numbers.

**<u>The Restatement Caused USPH to Violate Debt Covenants</u>**

153. More, in the 2016 10-K, Defendants disclosed that the restatement had caused them to be in violation of certain debt covenants, stating:

> Although the restatement of prior financial statements caused the Company to be in violation of our Amended Credit Agreement dated December 5, 2013, the Company was able to obtain necessary waivers and amendments, as applicable. On March 30, 2017, the Company entered into a Third Amendment to Amended and Restated Credit Agreement and Limited Waiver with its lenders. As of the date of this report, the Company is in compliance with the covenants in the Amended and Restated Credit Agreement.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

154. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired USPH securities publically traded on NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

155. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, USPH securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of USPH shares were traded publicly during the Class Period on the NYSE. As of November 4, 2016, USPH had 12,521,926 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by USPH or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

157. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

158. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company;

c. whether the Individual Defendants caused the Company to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of USPH securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

159. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABLITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)**

160. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. USPH securities are traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NYSE and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiff and members of the Class purchased, acquired and/or sold U.S. USPH securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

161. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

162. The market for USPH's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, USPH's securities traded at artificially inflated prices during the Class Period. On February 27, 2017, the Company's stock price closed at a Class Period adjusted high of $77.95 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's

securities relying upon the integrity of the market price of USPH's securities and market information relating to USPH, and have been damaged thereby.

163. During the Class Period, the artificial inflation of USPH's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about USPH's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of USPH and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

164. At all relevant times, the market for USPH's securities was an efficient market for the following reasons, among others:

a. USPH stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, USPH filed periodic public reports with the SEC and/or the NYSE; USPH regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

c. USPH was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

165. As a result of the foregoing, the market for USPH's securities promptly digested current information regarding USPH from all publicly available sources and reflected such information in USPH's stock price. Under these circumstances, all purchasers of USPH's securities during the Class Period suffered similar injury through their purchase of USPH's securities at artificially inflated prices and a presumption of reliance applies.

166. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

167. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of USPH who knew that the statement was false when made.

## **COUNT I**

### **Violations of Section 10(b) of the Exchange Act and Rule 10b-5 against All Defendants**

168. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

169. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

170. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout

the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of USPH securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire USPH securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

171. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for USPH securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

172. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

173. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of USPH securities from their personal portfolios.

174. The Company showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

175. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of USPH securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired USPH securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

176. During the Class Period, USPH securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or

relying upon the integrity of the market, purchased or otherwise acquired shares of USPH securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of USPH securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of USPH securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

177. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

178. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act against the Individual Defendants

179. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the

adverse non-public information about the Company's current financial position and future business prospects.

181. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to U.S. the Company's business practices, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

182. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of USPH securities.

183. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

184. Specifically, each of the Individual Defendants is a culpable participant because he was in direct communication with the SEC about the improper accounting treatment of the redeemable non-controlling interests of the Company's partnerships and therefore knew or recklessly disregarded that the Company's accounting for redeemable non-controlling interests of its partnerships was materially false. Notwithstanding their knowledge of the Company's improper accounting and the effect on their personal bonuses and share compensation, Defendants Reading, McAfee and Bates knowingly or recklessly certified the Company's materially false and misleading financial results.

185. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 12, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY 10007
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg, Esq.
Keith R. Lorenze, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: klorenze@rosenlegal.com

***Lead Counsel for Lead Plaintiff***

**GOLDBERG LAW PC**
Michael Goldberg, Esq.
1999 Avenue of the Stars
Suite 1100
Los Angeles CA 90067
Tel: 1800-977-7401
Fax: 1800-536-0065

***Additional counsel to Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of October 2017, a true and correct copy of the foregoing ***Second Amended Class Action Complaint for Violation of the Federal Securities Laws*** was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ *Jacob A. Goldberg*
Jacob A. Goldberg
The Rosen Law Firm, P.A.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: 215-600-2817
jgoldberg@rosenlegal.com