UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X

SEAN REILLY, individually and on
behalf of all others similarly
situated,

                  Plaintiff,

       - against -

U.S. PHYSICAL THERAPY, INC.,
CHRISTOPHER J. READING, LAWRANCE
W. MCAFEE, JON C. BATES, and
GLENN W. MCDOWELL

                  Defendants.
--------------------------------X

**MEMORANDUM AND ORDER**

17 Civ. 2347 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


## I.    INTRODUCTION

This federal securities class action was filed on behalf of all persons and entities who purchased or otherwise acquired the securities of defendant U.S. Physical Therapy, Inc. ("USPH" or the "Company") between November 6, 2014 and March 16, 2017, inclusive (the "Class Period").  Plaintiffs[1] alleged that USPH and four individual defendants, Christopher J. Reading, Lawrance W. McAfee, Glenn W. McDowell, and Jon C. Bates, violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and that the

---

[1]    On June 8, 2017, the Court appointed Sean Reilly as lead plaintiff and the Rosen Law Firm as lead counsel.  Order, June 8, 2017, ECF No. 11.

individual defendants violated Section 20(a) of the Exchange Act.  Before the Court is defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]  Because plaintiffs failed to adequately plead scienter, the motion to dismiss is granted.

## II.  <u>BACKGROUND</u>

The following allegations are drawn from plaintiffs' second amended complaint ("SAC") (ECF No. 26), and are assumed to be true for the purposes of this motion.  See <u>Glob. Network Commc'ns, Inc. v. City of New York</u>, 458 F.3d 150, 154 (2d Cir. 2006).  We also consider any statements or documents incorporated into the AC by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"),[3] and documents

---

[2]    Also pending before the Court is plaintiffs' motion to strike certain documents submitted as exhibits to defendants' motion to dismiss.  As described below, the motion to strike is granted in part and denied in part.

[3]    Of particular relevance to this motion are:  (1) USPH's Form 10-K for the period ending December 31, 2016, filed with the SEC on June 7, 2017, Vigna Decl. Ex. B, ECF No. 31-2 ("2016 10-K"); (2) USPH's Form 10-K for the period ending December 31, 2014, filed with the SEC on Mar. 12, 2015, Vigna Decl. Ex. C, ECF No. 31-3 ("2014 10-K"); (3) USPH's Form 10-K for the period ending December 31, 2013, filed with the SEC on Mar. 11, 2014, Vigna Decl. Ex. D, ECF No. 31-4 ("2013 10-K"); (4) USPH's Form 8-K, filed with the SEC on Mar. 16, 2017, Vigna Decl. Ex. H, ECF No. 31-8 ("3/16/17 8-K"); (5) USPH's Form 10-K for the period ending December 31, 2015, filed with the SEC on Mar. 4, 2016, Vigna Decl. Ex. I, ECF No. 31-9 ("2015 10-K"); (6) USPH's Form 10-Q for the period ending June 30, 2014, filed with the SEC on Aug. 7, 2014, Vigna Decl. Ex. K, ECF No. 31-11 ("2Q 2014 10-Q"); (7) USPH's Form 8-K, filed with the SEC on Mar. 10, 2016, Vigna Decl. Ex. CC, ECF No. 31-29 ("3/10/16 8-K"); (8) USPH's Form DEF14A (Definitive Proxy Statement), filed with the SEC on Aug. 15, 2017, Vigna Decl. Ex. DD, ECF No. 31-30 ("2017 Definitive Proxy Statement"); (9) USPH's Form DEF14A (Definitive Proxy Statement), filed with the SEC on Apr. 7, 2016, Vigna Decl. Ex. EE, ECF No. 31-31 ("2016 Definitive Proxy Statement"); (10) USPH's Form DEF14A (Definitive Proxy Statement), filed with the SEC on April 9, 2015, Vigna Decl. Ex. FF, ECF No. 31-32 ("2015 Definitive Proxy Statement"); (11) USPH's Form 8-K, filed with the SEC on Mar. 27, 2015, Vigna Decl. Ex. GG, ECF No. 31-33 ("3/27/15 8-K"); and (12)

possessed by or known to the plaintiffs and upon which they relied in bringing this action.[4]  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

## A.    Factual Background

### 1.    USPH

USPH is a Nevada corporation headquartered in Houston that is traded on the New York Stock Exchange.  SAC ¶ 12.   It operates outpatient physical therapy clinics that provide pre- and post-operative care and treatment for orthopedic-related disorders, sports-related injuries, preventative care, rehabilitation of injured workers, and neurological-related injuries.  SAC ¶ 24. Throughout the Class Period, defendant Christopher J. Reading served as USPH's CEO and Director, defendant Lawrance W. McAfee served as CFO, Executive Vice President, and Director, defendant

---

USPH's Form 8-K, filed with the SEC on Mar. 27, 2014, Vigna Decl. Ex. HH, ECF No. 31-34 ("3/27/14 8-K").

[4]     In particular, plaintiffs quoted at length from correspondence between USPH and the SEC, including:  (1) Letter from SEC Staff to Christopher Reading, dated Oct. 15, 2014, Vigna Decl. Ex. J, ECF No. 31-10 ("Ex. J"); (2) Letter from Lawrance W. McAfee to SEC Staff, dated Oct. 29, 2014, Vigna Decl. Ex. M, ECF No. 31-13 ("Ex. M"); (3) Letter from SEC Staff to Christopher Reading, dated Nov. 26, 2014, Vigna Decl. Ex. N, ECF No. 31-14 ("Ex. N"); (4) Letter from Lawrance W. McAfee to SEC Staff, dated Dec. 18, 2014, Vigna Decl. Ex. O, ECF No. 31-15 ("Ex. O"); (5) Letter from SEC Staff to Christopher Reading, dated Jan. 6, 2015, Vigna Decl. Ex. P, ECF No. 31-16 ("Ex. P"); (6) Correspondence between USPH and SEC Staff, dated Dec. 12, 2016, Jan. 6, 2017, Jan. 13, 2017, Feb. 10, 2017, Feb. 23, 2017, and Mar. 3, 2017, Vigna Decl. Ex. S, ECF No. 31-19 ("Ex. S"); Letter from SEC Staff to Lawrance W. McAfee, dated Mar. 10, 2017, Vigna Decl. Ex. T, ECF No. 31-20 ("Ex. T").  Plaintiffs also references excerpts of the Transcript of USPH's Q4 2016 Earnings Call, dated Mar. 16, 2017, Vigna Decl. Ex. Y, ECF No. 31-25 ("Ex. Y").

Glenn W. McDowell served as COO, and defendant Jon C. Bates served as Corporate Controller and Vice President.  SAC ¶¶ 13-16.

USPH has grown nationally over the last twelve years through strategic acquisitions of outpatient physical therapy clinics. SAC ¶ 26.  As of December 31, 2016, USPH operated 423 of its 540 clinics as "Clinic Partnerships."  SAC ¶ 26.  Under this arrangement, USPH owns a 1% general partnership and a 49-99% limited partnership interest in these clinics, with the therapists who manage the clinics owning the remaining interest as limited partners.  SAC ¶ 25.[5]  USPH refers to the partnership interests owned by the managing therapists as "non-controlling interests." SAC ¶ 25.

Under UPSH's agreements with some of its managing therapists, it is required to redeem the therapist's non-controlling interest if his or her employment ceases at any time after a specified number of years from the date that therapist acquired his or her non-controlling interest. 2016 10-K at 5.  Under other agreements, USPH has the right, but not the obligation, to purchase the therapist's non-controlling interest upon termination of his or her employment.  Id.

---

[5]     USPH operates a minority of its clinics through wholly-owned subsidiaries under profit-sharing arrangements with therapists.  SAC ¶ 25.

### 2. USPH's Accounting Practices for Non-Controlling Interests

The alleged securities fraud in this case concerns USPH's accounting practices for its managing therapists' non-controlling interests. We begin by providing some background information on accounting practices for non-controlling interests, which, according to the Financial Accounting Standards Board ("FASB"), "can be complex." Accounting Standards Codification Topic 480, Subtopic 10, Section 99 at 7 (Fin. Accounting Standards Bd. 2009), Vigna Decl. Ex. V, ECF No. 31-22 ("Ex. V"). FASB Accounting Standard Codification ("ASC") 480-10-S99 provides detailed guidance as to whether redeemable preferred stock should be classified as "temporary equity" or "permanent equity." Id. At its most basic level, this ASC provides that "equity instruments with redemption features that are not solely within the control of the issuer" should be classified as temporary equity. Id. at 7. ASC 480-10-S99 does "not attempt to deal with the conceptual question of whether such a security is a liability." Id. at 2.

By contrast, ASC 480-10-25 provides guidance as to whether certain financial instruments should be classified as a liability or an equity. Accounting Standards Codification Topic 480 Subtopic 10, Section 25 (Fin. Accounting Stds. Bd. 2009), Vigna Decl. Ex. X, ECF No. 31-24 ("Ex. X"). ASC 480-10-25 provides that "[a] mandatorily redeemable financial instrument shall be classified as

a liability unless the redemption is required to occur only upon the liquidation or termination of the reporting entity." Id. at 1.

USPH historically accounted for the managing therapists' non-controlling interests as either permanent or temporary equity. SAC ¶ 28. If a managing therapist could require USPH to purchase his or her non-controlling interest, typically after a defined period of time set forth in a limited partnership agreement (the "Holding Period"), the Company reclassified the recorded value of the non-controlling interest as temporary equity under the line item "Redeemable Non-Controlling Interests" or "RNCI." Id. The recorded value was the fair value of the non-controlling interest on the date the Company acquired a controlling interest in the partnership adjusted for any earnings attributable to the partnership and distributions made after acquisition. Id. If the Company deemed it probable that the managing therapist would assert his or her redemption rights or the Company reached an agreement to purchase some or all of the therapist's interest, the redeemable non-controlling interest was adjusted to its then-current redemption value. SAC ¶ 29. Each quarter, USPH would assess the probability that the redemption rights would be triggered, and accounted for the redeemable non-controlling interests accordingly. SAC ¶ 30.

USPH described its historical accounting practices for redeemable non-controlling interests in the "Significant Accounting Policies" section of its 2013-15 10-Ks as follows:

> The Company recognizes non-controlling interests as equity in the consolidated financial statements separate from the parent entity's equity. The amount of net income attributable to non-controlling interests is included in consolidated net income on the face of the statements of net income. Changes in a parent entity's ownership interest in a subsidiary that do not result in deconsolidation are treated as equity transactions if the parent entity retains its controlling financial interest. The Company recognizes a gain or loss in net income when a subsidiary is deconsolidated. Such gain or loss is measured using the fair value of the non-controlling equity investment on the deconsolidation date.

> When the purchase price of a non-controlling interest by the Company exceeds the book value at the time of purchase, any excess or shortfall is recognized as an adjustment to additional paid-in capital. Additionally, operating losses are allocated to non-controlling interests even when such allocation creates a deficit balance for the non-controlling interest partner.

> The non-controlling interests that are reflected as redeemable non-controlling interests in the consolidated financial statements consist of those outside owners that have certain redemption rights that are currently exercisable, and that, if exercised, require that the Company purchases the non-controlling interest of the particular limited partner. At December 31, [of the applicable year], the redeemable non-controlling interests reflect the book value of the respective non-controlling interests. The redeemable non-controlling interests will be adjusted to the fair value in the reporting period in which the Company deems it probable that the limited partner will assert the redemption rights and will be adjusted each reporting period thereafter. The adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although, the adjustments are not reflected in the statements of net income, current

accounting rules require that the Company reflects the
charge in the earning per share calculation.

2015 10-K at 44-45; 2014 10-K at 41; 2013 10-K at 46-47; SAC ¶ 90.

### 3. USPH's 2014-2015 Correspondence with the SEC

USPH and the SEC exchanged correspondence beginning in
October 2014 regarding the Company's accounting practices for its
non-controlling interests.  SAC ¶¶ 32-39.  On October 15, 2014,
the SEC sent a comment letter addressed to defendant Reading that
asked, inter alia, whether it was proper for USPH to include a
separate line item in its earnings per share reconciliation for
earnings per share from revaluations of its redeemable non-
controlling interests, rather than to include this item within its
basic and diluted earnings per share from continuing operations.
SAC ¶ 33; Ex. J at 4; see 2Q 2014 10-Q at 13.  The letter referred
to ASC 480-10-S99-3A-22, which discusses the appropriate earnings
per share treatment of certain non-controlling interests.  SAC ¶
33; see Ex. V at 13-14.

On October 29, 2014, USPH responded to the SEC's letter,
stating that its reporting of the revaluation of the redeemable
non-controlling interests was in accordance with FASB ASC 480-10-
S99-3A-22, and that its "reporting the Revaluation as a separate
line gives our investors the ability to compare our Company's
current results from operations to prior periods as well as to the
operating results of other companies within our sector."  SAC ¶ 34;

Ex. M at 6.  USPH's Form 10-Q for the period ended September 31, 2014, filed on November 7, 2014, did not mention any unresolved comments from the SEC.  SAC ¶ 36.[6]

On November 26, 2014, the SEC responded, asking USPH to provide details in support of its accounting for earnings per share using "net income attributable to common stockholders of $10,660 and not $9,574 which would reflect the adjustment for the revaluation of the redeemable non-controlling interests."  Ex. N at 3; see SAC ¶ 37.  USPH had a discussion with Ms. Angela Halac of the SEC on December 10, 2014, and sent a letter response on December 18, 2014.  SAC ¶ 38.  USPH indicated that it included the additional line item to be transparent with its investors and "so they can easily see the components and computation of [the Company's] earnings-per-share."  Id.

On January 6, 2015, the SEC wrote USPH a letter stating that it had completed its review of USPH's filings and did not require any action at that time, but that its "comments or changes to disclosure in response to [its] comments do not foreclose the Commission from taking any action with respect to the company . . . ."  Ex. P; see SAC ¶ 39.

---

[6]    USPH argues that issuers have a duty to disclose unresolved SEC comments only in a Form 10-K, not a Form 10-Q, and that the issue was resolved months before the Company's 2014 10-K was filed.  See Securities Offering Reform, Securities Act Release No. 33-8591 at 461-64 (effective Dec. 1, 2005), Vigna Decl. Ex. L, ECF No. 31-12.

### 4.   USPH's 2016-2017 Correspondence with the SEC

On December 12, 2016, nearly two years after the SEC's prior letter, the SEC's Accounting Branch Chief of the Office of Beverages, Apparel, and Mining sent a letter to defendant McAfee with a "comment" on USPH's Form 10-K:

> Please tell us the terms and conditions under which the non-controlling interests are redeemable.  Please tell us why the probability of a limited partner actually asserting the redemption rights is relevant to your accounting for redeemable non-controlling interests. Please disclose the circumstances under which redeemable non-controlling interests are deemed probable of redemption. Please also disclose your accounting for non-controlling interests that are probable of becoming redeemable in the future, if applicable. See paragraphs 13 through 16 of ASC 480-10-S99.

SAC ¶ 71; Ex. S. at 2.  As before, this letter cited ASC 480-10-S99, which addresses classification of non-controlling interests as temporary equity or permanent equity.

On January 6, 2017, defendant McAfee responded to this letter by explaining as follows:

> In conjunction with the agreements typically entered into by the Company and its subsidiaries to purchase a controlling interest in acquired partnerships which own and operate multi-clinic physical therapy practices, the Company enters into agreements with the non-controlling interest limited partners ("NC Partner") that, in the event the employment of the NC Partner ceases after a defined number of years from the acquisition date (the "Holding Period"), the Company is required to purchase the NC Partner's interest in the partnership at a predetermined multiple of earnings before interest, taxes, depreciation and amortization.  In the event that the employment of the NC Partner ceases prior to the end of the Holding Period, then the Company has the option to purchase the NC Partner's interest in the partnership

at a predetermined multiple of earnings before interest, taxes, depreciation and amortization, but the Company is not required to purchase the interest, regardless of which party initiates the termination of employment or the reason for such termination.

After the initial Holding Period has been satisfied, the redemption is not solely in control of the Company, i.e. the NC Partner or the Company can terminate the employment of the NC Partner. Therefore, in accordance with paragraph 12 (c) of ASC 480-10-S99, the book value, which is the fair value on the date of acquisition adjusted for any earnings attributable and distributions made subsequent to the date of acquisition, of the non-controlling interest is reclassified to temporary equity on the Company's consolidated balance sheet in the section labeled "Redeemable non-controlling interests" at the expiration of the Holding Period. Then, and in any subsequent reporting period that the Company deems it probable that the NC Partner will assert their redemption rights or the Company reaches an agreement to purchase some or all of the NC Partner interest, i.e. in the event the NC Partner continues to be employed but wants to sell a portion or all of his/her interests and the Company agrees, the redeemable non-controlling interest is adjusted to its redemption value and is adjusted in each reporting period thereafter in accordance with paragraph 15 (b) of ASC 480-10-S99 until purchased by the Company. The adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although the adjustments are not reflected in the statements of net income, current accounting rules require that the Company reflects the charge in the earning per share calculation. Quarterly, the Company assesses the probability that the redemption rights will be asserted based on discussions with the NC Partner regarding their employment status and accounts for it accordingly.

In response to the Staff's comment, the Company will revise the disclosure in its future filings to include the following information:

'In conjunction with the agreements typically entered into by the Company to purchase a controlling interest in acquired partnerships which own and operate multi-clinic physical therapy practices, the Company enters

into agreements with the non-controlling limited partner ("NC Partner") that, in the event that the employment of the NC Partner ceases prior to a defined number of years from the acquisition date (the "Holding Period"), then the Company has the option to purchase the NC Partner's interest in the partnership at a predetermined multiple of earnings before interest, taxes, depreciation and amortization, but the Company is not required to purchase the interest, regardless of which party initiates the termination of employment or the reason for such termination.

After the initial Holding Period has been satisfied, the redemption is not solely in control of the Company, i.e. the NC Partner or the Company can terminate the employment of the NC Partner. Therefore, in accordance with paragraph 12 (c) of ASC 480-10-S99, the book value, which is the fair value on the date of acquisition adjusted for any earnings attributable and distributions made subsequent to the date of acquisition, of the non-controlling interest is reclassified to temporary equity on the Company's consolidated balance sheet in the section labeled "Redeemable non-controlling interests" at the expiration of the Holding Period. Then, and in any subsequent reporting period that the Company deems it probable that the NC Partner will assert their redemption rights or the Company reaches an agreement to purchase some or all of the NC Partner interest, i.e. in the event the NC Partner continues to be employed but wants to sell a portion or all of his/her interests and the Company agrees, the redeemable non-controlling interest is adjusted to its redemption value and is adjusted in each reporting period thereafter in accordance with paragraph 15 (b) of ASC 480-10-S99 until purchased by the Company. Quarterly, the Company assessed the probability that the redemption rights will be asserted based on discussions with the NC Partner regarding their employment status and accounts for it accordingly. The adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although the adjustments are not reflected in the statements of net income, current accounting rules require that the Company reflects the charge in the earning per share calculation.'

SAC ¶ 72; Ex. S at 7-8.

The SEC, unconvinced by USPH's explanation that it accounted for the redeemable non-controlling interests differently during and after the initial Holding Period, responded a week later:

> As stated in paragraph 5 of ASC 480-10-S99-3A, the possibility that any triggering event that is not solely within the control of the issuer could occur — without regard to probability — would require the instrument to be classified in temporary equity. You indicate that you are required to purchase the non-controlling limited partners' interests in the event their employment ceases after the holding period. As a result, it appears that upon inception these agreements with non-controlling interest limited partners have redemption provisions that may not be solely within your control. Please tell us in greater detail why the non-controlling interests subject to these redemption provisions are not presented in temporary equity at inception pursuant to ASC 480-10-S99-3A.

SAC ¶ 73; Ex. S at 10-11. The SEC questioned USPH's consideration of the probability that a non-controlling interest "will be redeemed," as opposed to whether it "will become redeemable," which the SEC asserted was the proper analysis under paragraph 15 of ASC 480-10-S99-3A. SAC ¶ 73; Ex. S at 11.

USPH responded on February 10, 2017, conceding that its prior accounting for the non-controlling interests was incorrect and concurring with the SEC's analysis "that the non-controlling interests subject to redemption provisions should be presented in temporary equity at the inception of the agreement and adjusted at the end of each reporting period to its estimated redemption value." SAC ¶ 74; Ex. S at 14. USPH asserted that the "cumulative impact of this correction . . . [was] immaterial to the

consolidated financial statements taken as a whole," and stated that it would adjust its 2014 and 2015 financial statements when it released its 2016 Form 10-K in March 2017. SAC ¶ 74; Ex. S at 14. USPH provided the SEC with proposed additional disclosures and adjusted financial statements to reflect these changes. Ex. S at 15-18.

The SEC replied on February 23, 2017, asking USPH to "address the guidance in paragraphs 16(c) and 16(e) of ASC 480-10-S99-3A, and to "describe how you are applying the guidance in paragraph 22(b) of 480-10-S99-3A in accounting for your redeemable non-controlling interests." SAC ¶ 75; Ex. S at 19-22. USPH's March 3, 2017 response proposed a correction of its redemption value accounting for redeemable non-controlling interests, which would affect the amounts reported by the Company as permanent and temporary equity, as well as additional paid-in capital and deferred taxes. SAC ¶ 76.

On March 10, 2017, the SEC raised the issue of whether the Company's non-controlling interests should be classified as liabilities instead of either permanent or temporary equities. SAC ¶ 77. This letter asked whether the non-controlling interests had any "put, call or redemption requirements" that were "mandatorily redeemable financial instruments as that term is defined in ASC 480-10-20 and further described in ASC 480-10-25-4 to -7." Id. If ASC 480-10-25-4 to 7 applied, it would require

USPH to classify these mandatorily redeemable non-controlling interests as liabilities. See Ex. X at 1 ("A mandatorily redeemable financial instrument shall be classified as a liability unless the redemption is required to occur only upon the liquidation or termination of the reporting entity.").

On March 16, 2017, USPH issued a Form 8-K warning investors not to rely on its financial statements for the years ended December 31, 2014 and 2015, all quarters within 2014 and 2015, and the first three quarters of 2016. SAC ¶ 78; 3/16/17 8K at 4. Reporting a "material weakness in internal controls over financial reporting as they relate to this issue," the Company stated that its "historical accounting for redeemable non-controlling interests of acquired partnerships was incorrect due to the fact that these partnership agreements contain a provision that makes the non-controlling interests mandatorily redeemable and, thus incorrectly classified." SAC ¶ 78; 3/16/17 8K at 4. On March 16, 2017, the day this news was announced, USPH's common stock fell $3.85 per share, or 5.2%, to close at $69.90. SAC ¶ 82.

The following day, USPH held its Q4 2016 conference call where defendant McAfee explained: "[A]s we looked at it and the accountants look at it, what we realized was . . . since everybody's eventually is going to cease employment, whether that they retire or incapacitated or die, that makes it a mandatory redemption feature, which means that it needed to be treated

differently on the balance sheet and the income statement than the way we had. It's not that we ever try to hide from anybody. We've told people for years how we structure stuff. It was reviewed internally and externally. And it was just missed." Ex. Y at 4; see SAC ¶ 81. McAfee added that this accounting "error" would have "no impact on previously reported cash balances or net cash flow or EBITDA," nor would it "change[] the real world economics of [the Company's] business." Ex. Y at 4. USPH's stock price lost another $1.75 per share (2.5%) on Friday, March 17, 2017, and continued to fall the following week, losing $0.25 per share (0.3%) on March 20, 2017, and $3.15 per share (4.6%) on March 21, 2017, to close at $64.75. SAC ¶ 82.

On March 24, 2017, USPH acknowledged in a letter to the SEC that, based on its review of ASC 480-10-20 and ASC 480-10-25-4 to -7, "the redemption feature included in the partnership agreements should be considered a mandatorily redeemable financial instrument and accounted for accordingly, as a liability. Based on this determination, Management concluded that redeemable non-controlling interests have been historically accounted for incorrectly." SAC ¶ 83. The Company reached this conclusion because "[t]ermination of employment of such Individual is deemed certain to occur at some point in the future, such as by reason of death." Id. Because accounting for the redeemable non-controlling interests as liabilities instead of equities would result in

"quantitatively large" adjustments, the Company "determined that the correction of this error is a material change to its previously issued financial statements." Id.

### 5. USPH's 2016 Form 10-K Restatement

On June 17, 2017, USPH filed its belated 2016 10-K, which included restated quarterly and annual financial statements for 2014 and 2015, restated financial data for 2012-15, and revised analyses of its financial condition and results of operations for 2014 and 2015. SAC ¶ 85(a)-(d). In the 2016 10-K, USPH "identified a material weakness in our control over financial reporting which resulted in a material misstatement in our previously issued consolidated financial statements and a failure to meet our reporting obligations." SAC ¶ 86. This "material weakness" related to the Company's mandatorily redeemable non-controlling interests. Id. USPH stated that its "historical accounting for redeemable non-controlling interests of acquired partnerships was incorrect" because these "interests should be accounted for as a liability and not as temporary equity." SAC ¶ 87.

### 6. Defendants' Alleged Misstatements

Plaintiffs allege that defendants' materially false and misleading statements during the Class Period include filing Form 10-Qs, Form 10-Ks, and press releases that did not disclose violations of GAAP with respect to redeemable non-controlling interests, overstated earnings per share, understated total

liabilities, overstated net income, and did not disclose that the Company's internal controls over financial reporting were ineffective. SAC ¶¶ 42-70. USPH acknowledges that it has restated its financial statements to correct these SEC filings and that its previously issued financial statements contained material misstatements. 2016 10-K at 1, 43-45.[7]

### 7. Plaintiffs' Scienter Allegations

#### a) Bonuses

During the Class Period, defendants Reading, McAfee, and McDowell, the CEO, CFO, and COO of USPH, respectively, were eligible to receive four types of bonus awards: (1) the Objective Cash Bonus Plan provided for a potential cash bonus of a fixed percentage of their base salaries based on the Company's fully diluted earnings per share "before any extraordinary items"[8]; (2) the Discretionary Cash Bonus Plan provided for a potential cash bonus as determined at the sole discretion of the Company's Compensation Committee; (3) the Objective Long-Term Incentive Plan ("LTIP") provided for potential restricted stock awards to be awarded at the discretion of the Compensation Committee, with the maximum permissible amount based upon the achievement of performance goals relating to fully diluted earnings per share

---

[7]     USPH does not contest the "material misrepresentation or omission" element of plaintiffs' 10b-5 claim.

[8]     "Extraordinary items" is not defined in USPH's filings. See 3/16/16 8-K; 3/27/15 8-K; 3/27/14 8-K.

"before any extraordinary items"; and (4) the Discretionary LTIP provided for potential restricted stock awards as determined at the sole discretion of the Compensation Committee. SAC ¶ 114; 3/16/16 8-K at 3; 3/27/15 8-K at 3; 3/27/14 8-K at 3.

Plaintiffs' allegations focus on the Objective Cash Bonus Plan and Objective LTIP. SAC ¶ 114. USPH's practice for these bonus awards was to announce the target range for earnings per share, and then award Objective Cash Bonuses and Objective LTIP by comparing the Company's actual earnings per share (with potential adjustments for "extraordinary items") with the target range. See SAC ¶ 114; 3/16/16 8-K; 3/27/15 8-K; 3/27/14 8-K. Plaintiffs argue that defendants had the incentive to artificially inflate earnings per share through their accounting treatment of the non-controlling interests so as to increase these two "Objective" components of their bonuses.

### (1) 2014 Bonuses

On March 27, 2014, USPH filed a Form 8-K with the SEC that included a table for the Objective Cash Bonus calculation ranging from a bonus equal to 15% of base salary for earnings per share of $1.51 to a bonus equal to 75% of base salary for earnings per share of $1.70 or more. AC ¶ 116; 3/27/14 8-K. In USPH's 2015 Definitive Proxy Statement, filed with the SEC ON April 9, 2015, the Company calculated its earnings per share to be $1.71 and awarded defendants Reading, McAfee, and McDowell Objective Cash Bonuses

equal to 75% of their base salaries ($721,250, $525,000, and $471,250, respectively), as well as Objective LTIP of 20,000, 10,000, and 10,000 shares. SAC ¶¶ 117, 119; 2015 Definitive Proxy Statement at 14. Reading, McAfee, and McDowell were also awarded Discretionary LTIP of 20,000, 10,000, and 10,000 shares, respectively. 2015 Definitive Proxy Statement at 14.

### (2) **2015 Bonuses**

The next year, USPH set its goals for the objective bonus calculation higher, ranging from a bonus equal to 15% of salary for earnings per share of $1.77 to 75% for earnings per share equal to or exceeding $2.00. SAC ¶ 121; 3/27/15 8-K. The 2016 Proxy then calculated the adjusted fully diluted earnings per share as $1.80, which meant that Reading, McAfee, and McDowell received Objective Cash Bonuses equal to 21% of their base salaries ($124,950, $90,300, and $84,000, respectively), as well as Objective LTIP of 6,720, 3,360, and 3,360 shares. SAC ¶ 122; 2016 Definitive Proxy Statement at 14. Defendants received no Discretionary Cash Bonus in 2015, but Reading received Discretionary LTIP of 16,000 shares, and McAfee and McDowell each received 8,000 shares. 2016 Definitive Proxy Statement at 14.

### (3) **2016 Bonuses**

For 2016, USPH set bonus targets equal to 15% of salary for earnings per share of $1.86 and up to 75% of salary for earnings per share of $2.04 or more. SAC ¶ 126; 3/16/16 8K. USPH made its

restatement announcement before awarding bonuses in 2016. While the Company reported its 2016 earnings per share as $1.64, reflecting the restatement, it used an "adjusted diluted earnings per share" of $1.87 in 2016 for the purpose of determining its Objective Cash Bonus and Objective LTIP. SAC ¶ 127. USPH awarded Reading, McAfee, and McDowell $230,622, $166,668, and $155,040 in Objective Cash Bonuses, and 16,350, 8,175, and 8,175 in Objective LTIP, respectively. SAC ¶ 128; 2017 Definitive Proxy Statement.

### b) Stock Sales

Plaintiffs allege that defendants Reading, McAfee, and McDowell sold shares from their USPH stock holdings that were suspicious in timing and amount. SAC ¶¶ 142-52. None of these defendants had a 10b5-1 plan that predetermined the sales of their personal stock holdings in the Company. SAC ¶ 142.

After making four open market sales in the two years before the beginning of the Class Period in March 2014, defendant Reading sold 20,000 shares in November 2014 (21% of his non-restricted shares),[9] 25,000 shares in March 2015 (24% of his non-restricted shares), 25,000 shares in November 2015 (44% of his non-restricted shares), 15,000 shares on May 10, 2016 (31% of his non-restricted shares), and 8,000 shares on September 19, 2016 (19% of his non-

---

[9] Plaintiffs point out that these sales occurred just over a month after the Company received the SEC's initial comment letter on October 15, 2014. AC ¶ 143.

restricted shares).  SAC ¶¶ 143-45.  Plaintiffs do not allege that Reading has sold any USPH stock since September 19, 2016.  SAC ¶ 145.

Defendant McAfee sold 10,000 shares on November 7, 2014 (36% of his non-restricted shares),[10] 10,000 shares on March 6, 2015 (46% of his non-restricted shares), 2,650 shares on March 16, 2015 (22% of his non-restricted shares), 2,350 shares on March 20, 2015 (26% of his non-restricted shares), 2,000 shares on August 7, 2015 (13% of his non-restricted shares), 2,000 shares on August 25, 2015 (15% of his non-restricted shares), 4,000 shares on November 6, 2015 (25% of his non-restricted shares), 4,000 shares on December 16, 2015 (34% of his non-restricted shares), 5,000 shares on March 4, 2016 (42% of his non-restricted shares), 4,000 shares on May 6 and 9, 2016 (together, 38% of his non-restricted shares), 2,000 shares on June 10, 2016 (30% of his non-restricted shares), 2,000 shares on August 5, 2016 (22% of his non-restricted shares), 2,000 shares on August 22, 2016 (29% of his non-restricted shares), 2,000 shares on September 19, 2016 (41% of his non-restricted shares), 2,000 shares on November 10, 2016 (29% of his non-restricted shares), and 2,000 shares on November 22, 2016 (41% of his non-restricted shares).  SAC ¶¶ 146-48.  Plaintiffs do not

---

[10]    This sale occurred approximately three weeks after the receipt of the October 15, 2014 letter from the SEC.  AC ¶ 146.

allege that McAfee has sold any shares of his USPH holdings since November 22, 2016.  SAC ¶ 148.

Defendant McDowell made only two open market sales in the two years before the beginning of the Class Period, and then sold 19,621 shares on December 4 and 5, 2014,[11] 4,299 shares on March 16 and 17, 2015 (together, 97% of his non-restricted shares), 8,598 shares on August 10, 2015 (100% of his non-restricted shares), 4,299 shares on November 10 and 11, 2015 (100% of his non-restricted shares), 8,354 shares on May 9, 2016 (103% of his non-restricted shares),[12] 4,047 shares on August 9, 2016 (100% of his non-restricted shares), and 4,047 shares on November 15, 2016 (100% of his non-restricted shares).  SAC ¶¶ 149-51.  Plaintiffs do not allege that McDowell has sold any shares of USPH since November 15, 2016.  SAC ¶ 151.

Plaintiffs do not allege that defendant Bates made any stock sales during this period.

Notably, plaintiffs do not allege that any of the defendants sold a single share of USPH stock since December 12, 2016, the

---

[11]  Plaintiffs note that "these sales were sold under an S transaction code – an open market or private sale – and yet were marked as restricted." AC ¶ 149.

[12]  Defendants object to plaintiffs' usage of the percentage of "non-restricted shares" sold, noting that this calculation is misleading because plaintiffs also allege that plaintiffs sold restricted stock during this time period.  Defendants argue that when calculated as a percentage of the individual defendants' total holdings, no defendant ever sold more than 41% of his total holdings at any given time.  See Vigna Decl., Ex. LL, ECF No. 31-38.

beginning of the 2016-17 correspondence between the SEC and the Company.

### c) Debt Covenants

In USPH's 2016 Form 10-K, the Company disclosed that the restatement caused it to violate certain debt covenants, stating:

> Although the restatement of prior financial statements caused the Company to be in violation of our Amended Credit Agreement dated December 5, 2013, the Company was able to obtain necessary waivers and amendments, as applicable. On March 30, 2017, the Company entered into a Third Amendment to Amended and Restated Credit Agreement and Limited Waiver with its lenders. As of the date of this report, the Company is in compliance with the covenants in the Amended and Restated Credit Agreement.

SAC ¶ 153; 2016 10-K at 51.

### B. Procedural History

The initial complaint in this action was filed by Maura Culhane against USPH, Bates, McAfee, and Reading on March 31, 2017, and early notice was published the same day on Globe Newswire to all putative class members in accordance with 15 U.S.C. § 78u-4(a)(3)(A)(i). Compl., Mar. 31, 2017, ECF No. 1. The Court then appointed Sean Reilly as lead plaintiff[13] and approved his selection of the Rosen Law Firm as lead counsel. Order, June 8, 2017, ECF No. 11. Plaintiffs filed an amended complaint, adding McDowell as a defendant. Am. Compl., Aug. 4, 2017, ECF No. 18.

---

[13]    Reilly was the only member of the putative class to file a motion to be appointed lead plaintiff. See Mot. to Appoint Counsel & Lead Pl., May 30, 2017, ECF No. 8.

After defendants filed a pre-motion letter previewing their arguments for this motion to dismiss, the Court granted plaintiffs leave to file a second amended complaint. Order, Sept. 28, 2017, ECF No. 25. Plaintiffs then filed the SAC, alleging securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all defendants and control person liability under section 20(a) of the Exchange Act against the individual defendants. SAC, Oct. 12, 2017, ECF No. 26. Defendants filed their motion to dismiss on December 1, 2017, arguing that plaintiffs failed to allege the requisite scienter for the 10(b) claim and failed to state a control person claim against the individual defendants. Defs.' Mot. to Dismiss, Dec. 1, 2017, ECF No. 30. Along with their opposition to this motion, plaintiffs filed a motion to strike certain documents exhibited in defendants' motion to dismiss. Pls.' Mot. to Strike, Jan. 10, 2018, ECF No. 36.

### III. <u>Discussion</u>

**A. Legal Standard**

**1. Motion to Dismiss**

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor. <u>City of Providence v. BATS Global Mkts., Inc.</u>, 878 F.3d 36, 48 (2d Cir. 2017). Nevertheless, plaintiffs' factual allegations must "be enough to

raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). In addressing a motion to dismiss, a court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff[s] and upon which [they] relied in bringing the suit." ATSI, 493 F.3d at 98.[14]

---

[14]    Plaintiffs filed a motion to strike six of the forty-seven exhibits that defendants filed in connection with their motion to dismiss: four articles by PwC and WG&L describing the complexity of accounting for non-controlling interests (Vigna Decl. Exs. E, F, G, and UU, ECF Nos. 31-5, 31-6, 31-7, and 31-47), a table summarizing USPH's bonus calculations (Vigna Decl. Ex. II, ECF No. 31-35), and the transcript of a March 16, 2017 conference call (Vigna Decl. Ex. Y, ECF No. 31-25). We address these in turn.

While courts routinely take judicial notice of news articles in securities cases to assess whether information was in the public realm, see, e.g., Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006), such documents are not appropriately considered on a motion to dismiss for the substance of their contents, see Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991). Defendants cite Exhibits E, F, G, and UU in support of their substantive argument that accounting for non-controlling interests is complex, see Mem. of Law, Dec. 1, 2017, ECF No. 32 at 3, 4 n.4, 19-20, and we will not consider them for this purpose.

The Court also will not consider the portions of Exhibit II that contain legal argument. See, e.g., Ex. II at 1 n.2 ("Plaintiff's allegations concerning those years . . . are flawed in the same way.").

We clearly may consider the transcript attached as Exhibit Y, which is referred to in SAC ¶ 81. See ATSI, 493 F.3d at 98 (permitting the Court to consider "documents incorporated into the complaint by reference"). Plaintiffs argue that SAC ¶ 81 is based on a different version of this transcript, which they failed to submit to the Court, but they do not question the authenticity or accuracy of Exhibit Y as a transcript of the conference call referred to in the SAC. See Mem. of Law, Jan. 10, 2018, ECF No. 37 at 10 ("This Court also should strike Defendants' Exhibit Y because it

## 2.   Securities Fraud Claims under Section 10(b)

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."   17 C.F.R. § 240.10b-5(b).   In order to state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must adequately plead the following elements:   "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."   Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).

Claims under Section 10(b) must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure by "stat[ing] with particularity the circumstances constituting fraud or mistake."   Fed. R. Civ. P. 9(b); see ATSI, 493 F.3d at 99.   A complaint alleging securities fraud must also meet the requirements of the Private Securities Litigation Reform Act ("PSLRA"), which requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons

adds nothing that bears on the resolution of the issues raised in Defendants' motion to dismiss.").   Indeed, plaintiffs make no attempt to refute defendants' arguments regarding this exhibit in their reply brief.

why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996) (internal citations omitted)). In order to plead a strong inference of scienter, plaintiffs must allege either "(1) that defendants had the motive and opportunity to commit fraud," or "(2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).

In analyzing scienter, we assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007) (emphasis in original).

"To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 323-24. The inference must be more than merely reasonable or permissible; it must be "cogent and compelling . . . strong in light of other explanations." Id. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

**B. Analysis**

**1. Section 10(b) and Rule 10b-5 - Scienter**

Defendants challenge only the second element of a claim under Section 10(b) and Rule 10b-5, arguing that plaintiffs failed to allege scienter because they have neither adequately alleged that defendants had the requisite motive and opportunity to commit securities fraud nor adequately alleged conscious recklessness.

**a) Motive and Opportunity**

In the Second Circuit, "[s]ufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (quoting Novak, 216 F.3d at 307). However, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead,

plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit, 264 F.3d at 139.

Defendants argue that plaintiffs failed to plead any showing of motive.[15]  Plaintiffs respond that they have adequately pled motive based on their allegations in the SAC regarding defendants' bonuses, stock sales, and debt covenants.  We address each of these seriatim.

### (1) Bonuses

Plaintiffs allege that under USPH's Objective Bonus Plan, defendants Reading, McAfee, and McDowell earned higher bonuses than they would have absent USPH's accounting errors.[16]  Plaintiffs assert that these compensation packages established a "direct link" with the alleged fraud and therefore provide the requisite strong inference of scienter.  See Mem. of Law, Jan. 10, 2018, ECF No. 34 at 8.

Motives common to any corporate officer are insufficient to plead scienter.  See ECA, 553 F.3d at 198.  Therefore, "incentive compensation can hardly be the basis on which an allegation of fraud is predicated."  Id. at 201 (quoting Acito v. IMCERA Grp.,

---

[15]    Defendants do not contest that they had the "opportunity" to commit fraud.  Indeed, courts frequently assume that corporations and their officers and directors have the opportunity to commit fraud if they so desired.  See, e.g., In re Ambac Fin. Grp. Sec. Litig., 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010) (collecting cases).

[16]    Plaintiffs make no allegations regarding defendant Bates's bonuses during the Class Period.

Inc., 47 F.3d 47, 54 (2d Cir. 1995); see also Kalnit, 264 F.3d at 139-40. "If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" ECA, 553 F.3d at 201 (quoting Acito, 47 F.3d at 54); see also Wyche v. Advanced Drainage Sys., Inc., 710 F. App'x 41, 473 (2d Cir. 2017) ("Bonus compensation is not the type of 'concrete and personal' benefit upon which a finding of motive to commit securities fraud can be based.") (quoting Kalnit, 264 F.3d at 139).

Applying this rule, several courts in this Circuit have found that even multi-million dollar bonuses that plaintiffs alleged were directly tied to misstatements were insufficient evidence of motive. For example, in In re JP Morgan Chase Securities Litigation, 363 F. Supp. 2d 595, 622 (S.D.N.Y. 2005), defendants' total bonuses of $15 million that were allegedly dependent in part on the amount of business they conducted with Enron were deemed "deficient, as they involve[d] '[m]otives that are generally possessed by most corporate directors and officers.'" Id. (citing Kalnit, 264 F.3d at 139). Similarly, Lipow v. Net1 UEPS Technologies, Inc., 131 F. Supp. 3d 144, 153, 160-62 (S.D.N.Y. 2015), involved total bonus payments of $5.4 million directly

linked to defendants' securing a contract that was later deemed to be illegal and invalid.  The court rejected plaintiff's argument that these bonuses went beyond the "usual financial incentive arrangements of compensation based on the company's earnings," because "incentive compensation can hardly be the basis on which an allegation of fraud is predicated."  Id. (quoting ECA, 553 F.3d at 201).

The same logic applies here.  The bonuses paid to defendants, which allegedly were higher than they would have been but for the accounting treatment of the Company's redeemable non-controlling interests, comprise general performance-based compensation that cannot form the basis for motive to commit securities fraud.  See ECA, 553 F.3d at 201.

Plaintiffs argue that the Second Circuit precedent in Acito, Kalnit, and ECA is inapposite, and that the allegations in the complaint instead "align" with the decisions in In re Wellcare Management Group, Inc. Securities Litigation, 964 F. Supp. 632, 639 (N.D.N.Y. 1997), and Florida State Board of Administration v. Green Tree Financial Corp., 270 F.3d 645, 661 (8th Cir. 2001).  We initially observe that neither Wellcare nor Green Tree binds this Court.  To the contrary, we join several other courts in concluding that Wellcare's finding motive because defendants' incentive compensation increased because of their allegedly fraudulent conduct is inconsistent with the Second Circuit's decisions in

_Acito_ and its progeny.  _See_ _Lipow_, 131 F. Supp. 3d at 161; _In re Donna Karan Int'l Sec. Litig._, 97 Civ. 2011 (CBA), 1998 WL 637547, at *19 (E.D.N.Y. Aug. 14, 1998).

The Eight Circuit's decision in _Green Tree_ is distinguishable on its facts.  Plaintiffs in _Green Tree_ alleged that the defendant company's CEO was the highest paid business executive in the entire United States based on an employment contract that awarded him incentive pay of 2.5% of the company's pre-tax income in addition to his base salary.  270 F.3d at 661.  In the final year of this contract, the CEO pocketed a $102 million bonus based on an overstatement of earnings that the company's later restatement reduced by $25.9 million.  _Id._  The "unusual" structure and magnitude of the CEO's compensation package and the timing of the alleged fraud that formed the basis of the decision in _Green Tree_ are plainly inapposite here given the relative modesty and typicality of defendants' bonus compensation.  _Id._

Our conclusion that plaintiffs' allegations about defendants' bonuses are deficient because they comprise motives generally possessed by most corporate directors and officers ends this analysis.  _Kalnit_, 264 F.3d at 139.  Given the law in the Second Circuit regarding incentive compensation as the basis for motive, the parties' disputes over the exact amount, if any, that the Company's accounting errors affected defendants' bonuses are essentially academic.  These arguments, even if properly

presented, "can hardly be the basis on which an allegation of fraud is predicated." ECA, 553 F.3d at 198.

### (2) Stock Sales

Plaintiffs may sufficiently plead motive where they allege that "defendants misrepresented corporate performance to inflate stock prices while they sold their own shares." Kalnit, 264 F.3d at 139 (citing Novak, 216 F.3d at 307-08 (collecting cases)). This analysis focuses on whether the stock sales were unusual or suspicious in timing or amount. See Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999); Acito, 47 F.3d at 54; In re Iconix Brand Grp., Inc., No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *15 (S.D.N.Y. Oct. 25, 2017); In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 584 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015). Factors to be considered in this analysis include "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74-75 (2d Cir. 2001), cert. denied, 534 U.S. 1071 (2001). "[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." ECA, 553 F.3d at 198 (citing Novak, 216 F.3d at 308).

We begin by analyzing the timing of defendants' stock sales. Plaintiffs allege that defendants Reading, McAfee, and McDowell[17] sold significant portions of their stock on various occasions between the beginning of the Class Period and November 22, 2016, but do not allege that any defendant sold a single share of USPH stock after that date. Plaintiffs assert that the timing of defendants' stock sales was suspicious because some of these sales occurred shortly after the Company received a letter from the SEC on October 15, 2014 and throughout the period when USPH was exchanging correspondence with the SEC from October 2014 to January 2015. We are persuaded by defendants' response that this correspondence never addressed the possibility of accounting for non-controlling interests as liabilities, which was only raised in the 2016-17 correspondence, and thus did not bear directly on the issues that led to USPH's restatement.

The 2014-15 correspondence focused on whether it was proper for USPH to present separate line items in its financial statements for basic and diluted earnings per share related to the revaluation of redeemable non-controlling interests and earnings per share from continuing operations. Ex. J at 3; see 2014 2Q 10-Q at 3, 4, 13. USPH explained that it was important to their investors to be able to compare the components of its earnings-per-share

---

[17] Plaintiffs do not present any allegations regarding defendant Bates's stock sales during the Class Period.

calculations (both revaluation of redeemable non-controlling interests and results from operations) across reporting periods and therefore that this data belonged in the Consolidated Statements of Net Income, rather than merely a footnote. Ex. M at 5; Ex. O at 3. The SEC appeared to accept this explanation, stating on January 6, 2015 that it had "completed [its] review of [USPH's] filings]," and posed no further questions to the Company at that time. Ex. P at 2.

Plaintiffs argue that when the SEC cited ASC 480-10-S99-3A-22 in its October 2014 letter, it informed defendants that the non-controlling interests should be accounted for as liabilities. This argument is unavailing. ASC 480-10-S99-3A-22 by its explicit terms does "not attempt to deal with the conceptual question of whether [a non-controlling interest] is a liability." Ex. V at 2. The 2014-15 correspondence related to the Company's presentation of its financial statements and the propriety of its including a non-GAAP measure in its Consolidated Income Statements. The SEC did not raise the question of whether the Company should have accounted for the non-controlling interests as liabilities or cite ASC 480-10-25, the relevant accounting standards codification provision that differentiates between equity and liability, until March 10, 2017, more than three months after defendants' last stock trade. See Ex. T.

Moreover, the 2014-15 correspondence was resolved without USPH having to take any corrective action. See Ex. P. And even if the SEC had required USPH to remove the separate line item for revaluation of redeemable non-controlling interests from its Consolidated Income Statements, this adjustment would have had no effect on the computation of the Company's net income nor, correspondingly, on its earnings per share calculations. Plaintiffs' argument that the 2014-15 correspondence established that USPH's accounting treatment of its non-controlling interests was improper therefore has no basis in the underlying documents.[18] It was only in 2016-17 that the SEC raised the question of whether USPH's non-controlling interests should be accounted for as liabilities. Indeed, plaintiffs concede that the SEC's 2016-17 correspondence came "from a different angle" than the 2014-15 correspondence. Mem. of Law, Jan. 10, 2018, ECF No. 34 at 4.

The upshot of this analysis is that any stock sales that occurred prior to the 2016-17 correspondence were not "suspicious in timing," see Iconix, 2017 WL 4898228, at *15; Lululemon, 14 F. Supp. 3d at 584, because nothing in the record that suggests that

_____

[18]    While plaintiffs allege that the 2014-15 correspondence addressed the same topic as the 2016-17 correspondence, we need not accept that allegation as true where it is inconsistent with the underlying documents. See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 277 F. Supp. 3d 500, 510 (S.D.N.Y. 2017) ("If the allegations of a pleading are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the pleading.") (quoting In re Trusteeships Created by Tropic CDO I Ltd., 92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015)).

the SEC questioned USPH's accounting for redeemable non-controlling interests as equity instead of liability prior to November 22, 2016, the date of the last alleged stock sale.

Further, even if the defendants could have anticipated the SEC's inquiry in advance, their stock sales here were not "calculated to maximize the personal benefit from undisclosed inside information." City of Taylor Gen. Emp. Ret. Sys. V. Magna Int'l Inc., 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013) (quoting Sec. & Exch. Comm'n v. Rorech, 720 F. Supp. 2d 367, 414 (S.D.N.Y. 2010)). None of the defendants sold any stock in the final 100 days of the class period – the exact timing "when insiders would have 'rushed to cash out.'" City of Taylor, 967 F. Supp. 2d at 800 (quoting City of Brockton Ret. Sys. V. Shaw Grp. Inc., 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008)). Indeed, courts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure. See In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) ("Plaintiffs' allegations are empty vessels, as the trades occurred . . . many months before the release of any negative information that caused Gildan's stock price to plummet."); In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) ("The lapsing of . . . approximately four months between these substantial sales and the revelation of the alleged falsity, inescapably attenuates

any inference of scienter that may be drawn in Lead Plaintiffs' favor."); Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 154 & n.24 (D. Conn. 2007) (disregarding sales that occurred more than two months prior to disclosure); In re Sina Corp. Sec. Litig., No. 05 Civ. 2154 (NRB), 2006 WL 2742048, at *12 (S.D.N.Y. Sept. 26, 2006) (sales do not give rise to an inference of scienter when they occurred more than a month before adverse disclosure); In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 385-86 (E.D.N.Y. 2003) (two-month gap between sales and disclosure negated inference of scienter).

Plaintiffs next argue that defendants' stock sales were suspicious on the basis of their amount alone. See SAC ¶¶ 144 (defendant Reading sold 44% of his non-restricted shares on November 19 and 20, 2015), 148 (defendant McAfee sold 42% of his non-restricted shares on March 4, 2016 and 41% of his non-restricted shares on November 22, 2016), 150-51 (defendant McDowell sold all or nearly all of his non restricted shares on March 16 and 17, 2015, August 10, 2015, November 10 and 11, 2015, May 9, 2016, August 9, 2016, and November 15, 2016). But without more, the amount of stock sold cannot be determinative. Otherwise, any corporate insider who divests his stock holdings would furnish opportunistic plaintiffs with the requisite scienter to survive a motion to dismiss. To the contrary, courts routinely find that raw sales numbers alone are insufficient to establish scienter.

See, e.g., Singh v. Cigna Corp., 277 F. Supp. 3d 291, 318 (D. Conn. 2017) ("The selling of even considerable shares is not sufficient, standing alone, to infer scienter."); Lululemon, 14 F. Supp. 3d at 584-85; In re CRM Holdings, Ltd. Sec. Litig., 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012) ("The sale of a large volume of stock alone, however, is not enough to adequately plead scienter."). More fundamentally, there was nothing "unusual" or "suspicious" about defendants' trades, even if they were relatively large, because they occurred before defendants were on notice of the SEC inquiry as to whether the Company's non-controlling interests should be accounted for as equities or liabilities.

### (3) Debt Covenants

Plaintiffs' final scienter argument is based on defendants' alleged motive to avoid violations of certain debt covenants in USPH's credit agreements. This argument clearly fails. It is well settled that a company's desire to maintain a high bond or credit rating does not qualify as a sufficient motive for fraud. San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 814 (2d Cir. 1996); In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 450 (S.D.N.Y. 2005) ("[C]ourts in this Circuit have consistently held that allegations that a defendant was motivated to commit securities fraud by a desire to reduce its debt burden, or otherwise reduce borrowing costs, are insufficient to raise a scienter inference."). The

alleged motivation to maintain compliance with the covenants in the Company's credit agreements is plainly inadequate to support an allegation of intent to commit fraud. See In re Cross Media Marketing Corp. Sec. Litig., 314 F. Supp. 2d 256, 265 (S.D.N.Y. 2004). Plaintiff's general allegations here would apply equally to any company with debt covenants in its credit agreements, and "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Acito, 47 F.3d at 54.

Plaintiffs argue in response that the Court should draw a distinction between the general motivation to maintain a high credit rating and USPH's specific motivation to avoid violating its debt covenants and defaulting on its debt. However, plaintiffs do not plead any specific terms of the Company's covenants that provide it with anything more than the generic motivation to maintain a high credit rating, nor do they articulate why USPH was in greater peril of violating its covenants than any other corporation with a credit facility. See SAC ¶ 153.

Plaintiffs' reliance on Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000), and Howard v. Everex Systems, Inc., 228 F.3d 1057 (9th Cir. 2000), is misplaced. The Second Circuit's conclusion in Rothman that specific allegations that a company desired to keep its bond or credit rating high in order to consummate a corporate

transaction may be a sufficient motive for securities fraud does not salvage plaintiffs' generic allegations here, 220 F.3d at 93, and the Ninth Circuit's decision in Howard "is at odds with the Second Circuit caselaw," Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 157 n.25 (D. Conn. 2007).

Finally, plaintiffs assert that USPH's restatement of its financial statements caused it to violate its credit agreement, and defendants observe in response that the Company obtained violation waivers and has since refinanced its debt on more favorable terms. Neither argument is relevant to our analysis, which properly focuses on an ex ante assessment of defendants' motives, rather than an ex post assessment of the actual effect of the restatement. See, e.g., Shields v. Citytrust Bancorp, Inc., 25 F. 3d 1124, 1129 (2d Cir. 1994); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 n.16 (3d Cir. 1997) ("Securities laws approach matters from an ex ante perspective.").

### b) Conscious Misbehavior and Recklessness

Having found that plaintiffs failed to allege the requisite motive to defraud, we next turn to whether plaintiffs adequately plead strong circumstantial evidence of defendants' conscious misbehavior or recklessness.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the

circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142 (quoting Beck v. Mfrs. Hanover Tr. Co., 820 F.2d 46, 50 (2d Cir. 1987)). The Second Circuit has held that recklessness for this purpose means "conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (quoting Novak, 216 F.3d at 312) (emphases in original). "Conscious recklessness" requires conduct that "at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." S. Cherry, 573 F.3d at 109 (emphasis in original) (quoting In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000)).

In the context of violations of accounting rules, "'[a]llegations that the accounting rules are straightforward and the company's accounting treatment was obviously wrong' may create an inference of scienter." S.E.C. v. Egan, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) (quoting S.E.C. v. Espuelas, 579 F. Supp. 2d 461, 478 (S.D.N.Y. 2008)) (internal quotation marks omitted). By contrast, "where accounting standards are neither simple nor easily applied, a plaintiff cannot rely on misapplication of the accounting rules alone." Egan, 994 F. Supp. 2d at 565 (citing In

re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 566-67 (S.D.N.Y. 2004)).

It is readily apparent from the record in this case and the relevant Accounting Standards Codifications that the accounting issues at the heart of this dispute are neither simple nor easily applied. See Ex. V, Ex. X. A redeemable non-controlling interest may be classified as permanent equity, temporary equity, or liability depending on its character. Ex. V, Ex. X. "[P]referred securities that are redeemable for cash or other assets" must be "classified outside of permanent equity if they are redeemable (1) at a fixed or determinable price on a fixed or determinable date, (2) at the option of the holder, or (3) upon the occurrence of an event that is not solely within the control of the issuer." Ex. V at 4. "Determining whether an equity instrument is redeemable at the option of the holder or upon the occurrence of an event that is solely within the control of the issuer can be complex." Id. at 7 (emphasis added). The SEC provides that "all of the individual facts and circumstances surrounding events that could trigger redemption should be evaluated separately and that the possibility that any triggering event that is not solely within the control of the issuer could occur – without regard to probability – would require the instrument to be classified in temporary equity." Id. (emphasis in original). ASC 480-10-S99-3A provides specific guidance as to potential features that might

weigh in this analysis if the underlying interest is classified as a freestanding financial instrument, equity instrument subject to registration payment arrangements, share-based payment award, or convertible debt instrument with a separately classified equity component, among others.  Id. at 4-7.

ASC 480-10-25, which was not cited by the SEC in its correspondence with the Company until March 2017, provides that "[a] mandatorily redeemable financial instrument shall be classified as a liability unless the redemption is required to occur only upon the liquidation or termination of the reporting entity." Ex. X at 1.  That instrument could also become a liability if it "embodies a conditional obligation to redeem the instrument by transferring assets upon an event not certain to occur . . . if that event occurs, the condition is resolved, or the event becomes certain to occur."  Id.  Some of the terms companies are instructed not to consider are whether an instrument has "a) a term extension option, b) a provision that defers redemption until a specified liquidity level is reached, [or] c) a similar provision that may delay or accelerate the timing of a mandatory redemption."  Id. "If a financial instrument will be redeemed only upon the occurrence of a conditional event, redemption of that instrument is conditional and, therefore, the instrument does not meet the definition of mandatorily redeemable financial instrument . . . [h]owever, that financial instrument would be assessed at each

reporting period to determine whether circumstances have changed such that the instrument now meets the definition of a mandatorily redeemable instrument." Id. at 2. "If the event has occurred, the condition is resolved, or the event has become certain to occur, the financial instrument is reclassified as a liability." Id. at 2.

The complexity of these principles is self-evident to the Court. Further support for this conclusion comes from the fact that the SEC exchanged at least eleven letters over the course of nearly four years with USPH about various aspects of the Company's accounting for its non-controlling interests before the SEC even raised the issue of whether they might properly be classified as liabilities. See Exs. J, M, N, O, P, S.

By stark contrast, courts in this district have found violations of accounting rules to be "straightforward" and "obviously wrong" in situations where a company accounts for the sale of an asset and then a lease of the same asset a few months later, Egan, 994 F. Supp. 2d at 566, or where it recognizes revenue for sales that were entirely contingent on further approval of the buyer, Espuelas, 579 F. Supp. 2d at 482. These blatant violations of basic accounting principles are clearly not analogous to the facts here.

Further, USPH's independent auditor, Grant Thornton LLP, reviewed the accounting for non-controlling interests in each of

the years for which the Company eventually restated its financial statements. Each year Grant Thornton indicated that it had "assess[ed] the accounting principles used . . . by management," and concluded that USPH's consolidated financial statements presented the Company's financial position fairly and "in conformity with accounting principles generally accepted in the United States of America." 2015 10-K at 36; 2014 10-K at 33. The fact that USPH's independent auditor repeatedly signed off on its financial statements further suggests that the Company's accounting for its non-controlling interests was not "obviously wrong." See Wyche v. Advanced Drainage Sys., Inc., No. 15 Civ. 5955 (KPF), 2017 WL 971805, at *17 (S.D.N.Y. Mar. 10, 2017) (finding that the independent auditor's failure to identify GAAP violations suggests "that the proper application of GAAP to the Company's finances was no easy task, even for a party with significant knowledge and expertise"); In re Turquoise Hill Res. Ltd. Sec. Litig., No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *6 ("It is noteworthy that the outside auditors did not question the corporate defendant's accounting practices.") (quoting In re Bausch & Lomb, Inc. Sec. Litig., 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008)) (internal modifications omitted). And plaintiffs here in no way suggest that the Company's auditors were complicit in the alleged fraud. Cf., e.g., In re Winstar Commc'ns, No. 01 Civ. 3014 (GBD), 2006 WL 473885, at *2 (S.D.N.Y. Feb. 27, 2006)

(alleging that GAAP violations were committed with the consent of the company's auditors or at their design).

Nor is there any allegation here that the Company concealed any relevant aspect of the non-controlling interests from its auditors or the SEC to perpetuate an accounting fraud. To the contrary, the Company's Form 10-Ks in the years prior to the restatement included fulsome disclosure about the nature of the non-controlling interests and the way USPH was (incorrectly, as it turned out) accounting for them. See 2015 10-K at 44-45; 2014 10-K at 41; 2013 10-K at 46-47; supra Section II.A.2.

Plaintiffs argue in response that the SEC's 2014-15 correspondence with USPH "concern[ed] the very GAAP that ultimately caused the Company to restate," such that the Company was on notice for several years that it was accounting for these interests incorrectly. ECF No. 34 at 18. However, as discussed above, the SEC's 2014-15 correspondence never raised the question of whether the non-controlling interests should be classified as liabilities, nor did it reference the ASC provision under which UPSH eventually determined that it had made an accounting error.

Plaintiffs also rely on the "core operations doctrine," which provides that "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the

statements were false when made." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); see generally Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989). Plaintiffs concede that this doctrine may provide "supplemental support" but does not "independently establish scienter," see Lipow, 131 F. Supp. 3d at 163 (quoting New Orleans Emp. Ret. Sys. V. Celestica Inc., 455 F. App'x 10, 14 n.3 (2d Cir. 2011)), and several courts in this Circuit have expressed "doubts as to the doctrine's continuing import" after the enactment of the PSLRA, In re Rockwell Med., Inc. Sec. Litig., No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018); In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) ("[T]he plain language of the PSLRA, which requires facts supporting the scienter inference to be 'state[d] with particularity,' would seem to limit the force of general allegations about core company operations."); see also Frederick v. Mechel OAO, 475 F. App'x 353, 356 (2d Cir. 2012) ("[W]e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter.").

In any event, the "core operations doctrine" typically applies only where "the operation in question constitute[s] nearly all of a company's business." Rockwell, 2018 WL 1725553, at *14 (quoting Thomas v. Shiloh Indus., Inc., No. 15 Civ. 7449 (KMW), 2017 WL 1103664, at *4 (S.D.N.Y. Mar. 23, 2017)). The cases cited

by plaintiff are illustrative. <u>Atlas Air</u>, 324 F. Supp. 2d at 484, 491, involved a company that leased aircraft to international airlines that allegedly failed to recognize the impairment of the value of those planes, resulting in a restatement of its retained earnings from $185 million to an accumulated deficit of $178 million. <u>Winstar</u>, 2006 WL 473885, at *2-5, 7-8, involved a wireless-broadband communications company that allegedly falsified transactions to significantly inflate its revenues and would have been insolvent but for the fraudulent accounting practices implemented. By contrast, the present case involves a disputed technical accounting issue, not a large-scale accounting fraud that undermined the ongoing viability of the Company's core business. <u>See, e.g.</u>, 2016 10-K at 31, 41 (reporting an increase from $37,520,000 to $51,050,000 in net cash provided by operating activities from the previous year, and stating that the "business is generating sufficient cash flow from operating activities to allow us to meet our short-term and long-term cash requirements, other than those with respect to future significant acquisitions").

More fundamentally, USPH's core operation is operating outpatient physical therapy clinics, not accounting for its managing therapists non-controlling interests. <u>See In re JP Morgan Chase Sec. Litig.</u>, 363 F. Supp. 2d at 628 ("[P]laintiffs allege no facts suggesting that the accounting treatment of the Mahonia

transactions as trades rather than as loans was at the core of JPM Chase's business.").

Plaintiffs next argue that the Sarbanes-Oxley ("SOX") certifications signed by defendants Reading, McAfee, and Bates were probative of scienter. SOX certifications may be probative of scienter if the complaint alleges "'glaring accounting irregularities or other red flags,' of which the certifying defendant had 'reason to know.'" In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d at 304-05 (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006)). However, these certifications typically "add nothing substantial to the scienter calculus" because "allowing Sarbanes-Oxley certifications to create an inference of scienter in every case where there was an accounting error . . . by a public traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA." Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp., 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016) (quoting Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1003-04 (9th Cir. 2009)). As discussed above, plaintiffs have not adequately alleged that defendants had any knowledge of "glaring accounting irregularities" when they executed the SOX certifications in the Company's 10-Ks. Rather, the accounting guidance at issue here was complex, the accounting treatment of the non-controlling interests was difficult to apply, and the SEC did not raise the relevant ASC until March 2017.

Plaintiffs therefore do not adequately allege that the defendants' certifications were knowingly false when made.

### c)   Conclusion

Plaintiffs argue in the alternative that their motive and recklessness allegations support one another, so that these allegations viewed in conjunction adequately plead scienter, even if neither does standing alone.   Plaintiffs are correct that Tellabs instructs us "not to scrutinize each allegation in isolation but to assess all the allegations holistically."   551 U.S. at 326; see In re Silvercorp Metals, Inc. Sec. Litig., 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014) ("[C]ircumstantial evidence of reckless and misconduct that strongly buttress the motive alleged . . . turn what might be a weak inference standing alone into a strong one.").   However, inadequate allegations of motive and inadequate allegations of recklessness cannot be combined to demonstrate scienter – zero plus zero cannot equal one.   See Kalnit, 264 F.3d at 141.

Here, defendants' incentive compensation cannot form the basis for scienter, defendants did not sell a single share of stock after the SEC raised the issue of whether the non-controlling interests should be accounted for as liabilities, the Company's debt covenants did not provide any motive to commit fraud, the accounting standards at issue were complex and difficult to apply, such accounting was not the Company's "core operation," and

defendants' SOX certifications were not probative of scienter. Viewed holistically, plaintiffs' allegations therefore fail to state with particularity facts that would give rise to a strong inference of scienter.

### 2. Section 20(a)

Plaintiffs also allege that the individual defendants, Reading, McAfee, Bates, and McDowell, are liable under Section 20(a) of the Exchange Act because they acted as "controlling persons" of USPH who participated in its alleged securities fraud. SAC ¶¶ 179-85. Section 20(a) provides for joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). To establish a prima facie case of control person liability, a plaintiff must show a primary violation by the controlled person. ATSI, 493 F.3d at 108. Because plaintiffs have failed to plead a primary violation by USPH, their Section 20(a) claims also fail. See Slayton v. Am. Express Co., 604 F.3d 758, 778 (2d Cir. 2010).

## IV. CONCLUSION

For the foregoing reasons, we grant defendants' motion to dismiss in its entirety with prejudice.[19] The Clerk of Court is respectfully directed to terminate the motions pending at ECF No. 30 and ECF No. 36, enter judgment for defendants, and close this case.

Dated:   New York, New York
         July 23, 2018

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[19]   Plaintiffs have not sought leave to amend, and the Court declines to offer them an opportunity to do so. See Wyche, 2017 WL 971805 at *18; Schwartz v. HSBC Bank USA, N.A., No. 14 Civ. 9525 (KPF), 2017 WL 95118, at *8 (S.D.N.Y. Jan. 9, 2017); see also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1132 (2d Cir. 1994) ("[W]e do not deem it an abuse of the district court's discretion to order a case closed when leave to amend has not been sought."). Plaintiffs have already amended their complaint twice, and no aspect of the record provides any indication that repleading would remedy the deficiencies outlined in this opinion. See Knife Rights, Inc. v. Vance, 802 F.3d 377, 389 (2d Cir. 2015) (leave to amend may be denied if the amendment would be futile). Because plaintiffs have not requested to amend and any further leave to amend would be futile, the Court dismisses this matter with prejudice.

54

Counsel for Plaintiffs:      Jacob A. Goldberg
                             Keith R. Lorenze
                             Phillip C. Kim
                             The Rosen Law Firm, P.A.

Counsel for Defendants:      Bruce G. Vanyo
                             Michael J. Diver
                             Jason C. Vigna
                             Katten Muchin Rosenman LLP